WINDBOURNE, Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

DOMANGUE, Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

MAHFOUD, Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (Behar), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (Abbate), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (Alzozo), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (Daha), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

BRIGHT, Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

HICKEY, Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (R. Bigio), Plaintiff,

v.

EASTERN AIR LINES, INC., et al.,

Defendants (two cases).

O'ROURKE (P. Hansen), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

Mary HANSEN (P. Hansen), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (W. Hansen), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

Karin M. HANSEN (W. Hansen), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (Merkouris), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

JENNINGS (Merkouris), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (Priniotakis), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

CAPPIELLO (Priniotakis), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (Alexandridis), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

CAPPIELLO (Alexandridis), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (Manias), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

JENNINGS (Manias), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

O'ROURKE (Hadzis), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

CAPPIELLO (Hadzis), Plaintiff,

v.

EASTERN AIR LINES, INC., et al., Defendants.

Nos. 76 C 237, 76 C 241, 76 C 457, 76 C 250—76 C 253, 76 C 572, 76 C 573, 76 C 1023, 76 C 1024, 76 C 255, 76 C 256, 76 C 258, 76 C 260, 76 C 265, 76 C 1022 and 76 C 1025.

United States District Court, E. D. New York.

May 11, 1979.

William F. C. Geoghan, Geoghan, Tutrone & Grossman, New York City, for Hansen plaintiffs:

William A. Jennings, San Jose, Cal., for Manias and Merkouris plaintiffs.

Edward M. Katz, Phillips & Cappiello, New York City, for Priniotakis, Alexandridis and Hadzis plaintiffs.

George E. Farrell, Healey & Farrell, Washington, D. C., for Mahfoud plaintiff.

Milton G. Sincoff, Kreindler & Kreindler, New York City, Frank H. Granito, Jr., Speiser & Krause, New York City, Jack C.

Benjamin, Kierr, Gainsburgh, Benjamin, Fallon & Lewis, New Orleans, La., Tony B. Jobe, New Orleans, La., for plaintiffs.

Walter E. Rutherford, Haight, Gardner, Poor & Havens, New York City, for defendant Eastern Air Lines.

Michael J. Pangia, Asst. Director, Torts Branch Civ. Div., U.S. Dept. of Justice, Washington, D. C., for defendant United States.

## MEMORANDUM OF DECISIONS AND ORDERS

BRAMWELL, District Judge.

The motions and cross motions before the Court today comprise but another phase in the complicated legal motif emanating from the unwinding arabesque of MDL 227. While the first motion interposed by Eastern Air Lines appeared simple enough, its complexity grew with the stream of further motions, cross motions, reply affidavits and further reply affidavits that poured in quickly thereafter. Indeed, this litigation, which arises out of the tragic air crash of Eastern's flight 66 at Kennedy Airport on June 24, 1975,[1] is like writing the first sentence of a book that may never be completed. Like Hydra who grew back two heads to replace the one that had been severed, the resolution of one problem in this case appears to breed at least two additional new ones. And the Court not being Hercules, this regeneration continues.

The origin of the plaintiffs' motions and cross motions and Eastern's motions and cross motions in the non-disputed representative cases[2] may be traced back to certain pre-trial events which transpired in the fall of 1978. To retreat to an earlier phase of this litigation, on September 15, 1978, the plaintiffs in these non-disputed cases approached the bench for the severance of their actions from the impending damage trial and for the entry of judgments on liability against Eastern Air Lines on the basis of the Warsaw Convention as supplemented by the Montreal Agreement. In each of these cases, Eastern Air Lines had interposed in its answer as a first affirmative defense that

[t]he travel of plaintiffs' decedent involved international transportation subject to all terms and conditions of the Warsaw Convention (49 Stat. 3000 et seq.), as amended by the Hague Protocol thereto (if applicable), and as supplemented by the Montreal Agreement of May 4, 1966 (if applicable), and defendant Eastern Airlines, Inc. therefore claims exemption from and limitation of liability in

---

1. A brief sketch of the factual background of this case was set forth in this Court's Decision and Order of December 1, 1978. Thus, no facts will be reiterated at this time. Subsequent to this Decision, however, certain events transpired which are worthy of mention.

On January 16, 1979, those cases involved in the trial of MDL 227, which were certified pursuant to 28 U.S.C. § 1292(b) (1976), were accepted for appeal by the Second Circuit Court of Appeals. On the same day, the Circuit Court upheld from the bench this Court's Rule 60(a) change directing that the Rule 54(b) language employed by the Clerk of the Court in the entry of the Warsaw/Montreal judgments in the non-disputed representative cases, see n. 2, infra, be deleted. Consequently, the Circuit Court found that it lacked the requisite power to entertain Eastern's appeal from the entry of said judgments. The Circuit Court, however, strongly urged this Court to grant a certification of these non-disputed representative Warsaw/Montreal judgments pursuant to 28 U.S.C. § 1292(b) (1976). One of the sets of motions

involved herein concerns Eastern's request to this effect.

2. Without passing judgment on the merits of certain defenses interposed by Eastern which do indeed dispute the representatives' capacity to sue in each of these cases, since these cases involve only one appointed representative (except, perhaps, for the Behar case) they have been characterized by all involved in this litigation as "non-disputed representative cases." On September 15, 1978, there were fifteen cases that fit within this category. However, only eleven of these cases are involved in the instant matter. See section I, infra. With respect to the Behar case, it appears that an administrator, Luigi Gabay, may have been appointed in Venezuela subsequent to the appointment of Tierney O'Rourke as administrator of the estate of Behar by the Queens County Surrogate's Court. However, since he has not contested Mr. O'Rourke's appointment or claimed that he is the only proper party to proceed in this action, the Behar case has been included in the "non-disputed" category.

accordance with the terms and conditions of the said Warsaw Convention and/or Hague Protocol and/or Montreal Agreement.

After hearing argument on this matter, and for reasons hereinafter discussed in section I, *infra*, the Court granted the plaintiffs' motions from the bench over the objection of Eastern Air Lines. Thereafter, orders to this effect were drafted by Eastern Air Lines and signed by the Court on September 22, 1978.

The autumn of 1978 was prolific regarding legal matters, for the motions in the disputed representative cases also possess this time as a common genesis. As more fully explained in section II, *infra*, on September 15, 1978, Tierney O'Rourke, one of the plaintiff-representatives in each of these cases, appealed to this Court to enter liability judgments, predicated on the Warsaw/Montreal system, against Eastern Air Lines on behalf of the plaintiffs in these suits. In doing so, he noted that the above quoted defense was interposed by Eastern Air Lines in the disputed as well as the non-disputed representative actions. However, troubled by the visibly awkward posture of the plaintiffs in the disputed cases as they then stood at bar, Mr. O'Rourke's motions were not granted at that time. Some time later, however, after formal motions had been made and argument had been heard, on December 15, 1978 said motions were conditionally granted. See section II, *infra.*

Adhering to its hydra-headed nature, said rulings inspired the birth of the numerous motions before the Court today. In order to achieve some utility of insight into said motions, rather than setting forth the substance of each motion at this time, they have been divided into separate categories and will be discussed accordingly.

**3.** On March 22, 1979, the eve before this Court rendered its oral decisions on the motions herein, notification was received from the attorney for the plaintiffs in the *Daha* and *Alzozo* cases that said cases were proceeding to settlement. Such midnight changes are not uncommon to this litigation. However, the luxury of time and its concomitant experience have taught that problems promised to be resolved are of-

## I

## PLAINTIFFS' REQUESTS FOR A RULE 54(b) AMENDMENT OF THE WARSAW/MONTREAL JUDGMENTS IN THE NON–DISPUTED REPRESENTATIVE CASES.

### A

#### *Background*

The plaintiffs in the *Behar, Abbate, Daha, Bright, Hickey, Edmund Bigio, Raphael Bigio* and *Alzozo* cases[3] move and the plaintiffs in the *Windbourne, Domangue* and *Mahfoud* cases crossmove for an order pursuant to Rule 54(b) of the Federal Rules of Civil Procedure amending their liability judgments entered against Eastern Air Lines on the basis of the Warsaw Convention as supplemented by the Montreal Agreement. Specifically, they ask that said judgments be amended to reflect that Eastern is not precluded thereby from raising any defenses it may have against them. Further relief is sought by the plaintiffs in the form of a request that this Court also reaffirm the grant of the motions which sired the disputed judgments.

Adhering to its litigious nature, Eastern Air Lines vigorously opposes the grant of the instant motions. In doing so, it initially argues that Rule 54(b) provides neither the method nor the requirements for the amendment of a judgment. Accordingly, Eastern concludes that Rule 60 of the Federal Rules of Civil Procedure applies to the instant request, not Rule 54(b). Eastern also directly attacks the propriety of a Rule 54(b) amendment, noting that the plaintiffs have cited no authority supporting any such action.

Additionally, Eastern maintains that this Court erred in granting the plaintiffs' War-

ten not in fact resolved. Therefore, this Court has considered the *Daha* and *Alzozo* plaintiffs' requests for relief in this Memorandum and Order. In the event that these plaintiffs' settlements are indeed brought to fruition at or near the time of the issuance of this Opinion, the parties are to so notify the Court, and they need not settle any orders in conformity with the rulings herein.

saw/Montreal motions in that it should have reviewed the individual facts and pleadings of each case, determined the applicable law, and then decided whether the actions could continue to be prosecuted. Considering that this Court did not adopt this approach, Eastern concludes that these issues cannot be resolved now. Rather, Eastern contends that they are to be resolved by the Second Circuit unless, of course, this Court vacates the Warsaw/Montreal judgments *sua sponte* and sets the plaintiffs' motions down for a hearing on the merits. It bolsters its argument further by stating that, by virtue of the requested amendment, the plaintiffs are only trying to cure or mitigate the lack of due process which occurred when their motions were granted from the bench.

The plaintiffs, on the other hand, note at the outset the significant absence of any claim by Eastern that the Warsaw/Montreal system is not applicable to and thus does not govern their cases. And even if Eastern was denied procedural due process at the time said motions were granted, the plaintiffs contend that their instant noticed motions have served the function of affording it due process now.

**B**

*Discussion of Rule 54(b)*

■ In light of Eastern's allegation that this Court may not amend the disputed judgments pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, a discussion of the propriety of granting the plaintiffs' motions must necessarily start with an examination of Rule 54(b) itself:

When more than one claim for relief is presented in an action, . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, *and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

Fed.R.Civ.P. 54(b) (emphasis added).

At this point in this litigation, the interlocutory nature of the Warsaw/Montreal judgments is not open to dispute. Such an issue was first resolved by this Court in its Decision and Order of December 1, 1978 and was finally put to rest by the Second Circuit's statement from the bench on January 16, 1979:

In the case of the summary judgment relating to the Warsaw Convention cases we find that we have no authority to overrule the Rule 60(a) change made by Judge Bramwell on the clerk's Rule 54(b) statement and since there has been no 1292(b), we are without jurisdiction at the moment.

Since the Warsaw/Montreal system judgments are not final, the Second Circuit's statement in *Acha v. Beame*, 570 F.2d 57 (2d Cir. 1978), is of direct significance:

Under the express directives of Rule 54(b) itself, such *an interlocutory judgment is "subject to revision at any time before the entry of judgment adjudicating all of the claims and the rights and [the] liabilities of all of the parties."* . . . . Whether such revision is appropriate in any given case is within the sound discretion of the trial judge.

*Id.* at 63 (citations omitted and emphasis added). *Accord, Bache & Co., Inc. v. Taylor*, 458 F.2d 395, 396 (5th Cir. 1972) (per curiam); *Fireman's Fund Insurance Co. v. Myers*, 439 F.2d 834, 838 (3d Cir. 1971); *United States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir. 1970); *Carey v. Greyhound Co.*, 424 F.2d 485, 487 (9th Cir. 1970); *Premier Industrial Corp. v. McGuire*, 423 F.2d 1198 (5th Cir. 1970) (per curiam); *United Bonding Insurance Co. v. Stein*, 410 F.2d 483, 485 (3d Cir. 1968) (per curiam);

*Stewart v. Bishop*, 403 F.2d 674, 680 (8th Cir. 1968). These cases also bear relevance on Eastern's assertion in its memoranda of law in opposition to the plaintiffs' Rule 54(b) motions that Rule 54(b)

> merely defines the nature and character of a judgment upon multiple claims or involving multiple parties . . . [and] does not provide the method or requirements for an amendment of a judgment.

A reading of the above cited cases indicates that Rule 54(b) revisions are often accomplished by use of the same procedure employed here, that is, by way of noticed motion.

As has been noted, Eastern additionally argues that a Rule 54(b) revision can only be accomplished by reference to Rule 60's limitations on amendment of a judgment and to its procedure. Worthy of mention, however, is that Rule 60(b) applies only to a "final judgment, order or proceeding." Since Rule 54(b) speaks only of non-final judgments and since said judgments by their very nature are inconsistent with final judgments, in advancing this argument Eastern Air Lines is unsuccessfully attempting to harness a paradox.

Eastern's reliance on Rule 60(a) is similarly unavailing. While Rule 60(a) applies broadly to judgments, orders or other parts of the record, it is the medication to be applied to cure clerical errors. Unlike the situation presented to this Court on December 1, 1978, no clerical errors are claimed to exist regarding these judgments at this time. Moreover, if use of Rule 54(b)'s broad revisionary powers was to be limited to cases where a Rule 60(a) amendment is proper, not only would the legislature have so stated but also there would be absolutely no reason for the existence of that portion of Rule 54(b) relied on herein.

In light of the incontestable nature of these judgments, coupled with the clear import of Rule 54(b)'s directive and the abundant case law supporting a court's revision-ary power, this Court fails to see any merit in Eastern's argument that this Court cannot revise these judgments. Of further note in this regard is the apparent inconsistency in Eastern's position. At the outset, it tells the Court it cannot amend the judgments. Despite this claimed lack of power, however, it argues that this Court can vacate them *sua sponte.* Indeed, it appears that the Court can do either. *See United States v. Desert Gold Mining Co., supra* at 715.

Now that it has been established that the Court possesses the power to revise the Warsaw/Montreal judgments, the next question to be answered is whether it should exercise its discretion and do so. *See Acha v. Beame, supra* at 63. In order to answer this question as well as to reach a decision on the plaintiffs' requests that the Court affirm the grant of their Warsaw/Montreal motions, the reasoning underlying this ruling must be explored. The logical starting point for such an examination is a discussion of the Warsaw/Montreal system itself.

C

*The Warsaw/Montreal System*

Despite the infancy of the aviation industry in 1929, numerous nations "[s]aw the heavens fill with commerce, argosies of magic sails." Tennyson, "Locksley Hall." Accordingly, in order to protect the industry in its earliest stages from an apocalyptic financial fate and to establish uniformity in the laws among nations in the event of aircraft accidents, numerous nations entered into the Convention for the Unification of Certain Rules Relating to International Transportation by Air. 49 Stat. 3000 (1934) (reprinted in supplement to 49 U.S.C. § 1502).[4] While the United States was not one of the original participating parties, adherence to this treaty was advised by the United States Senate on June 15, 1934 and

---

4. The Warsaw Convention is drafted in French and is printed in French in the United States Statutes at Large. 49 Stat. 3000–3009. The English translation follows the official French version. 49 Stat. 3014–3023.

was proclaimed by the President on October 29, 1934.[5]

Commonly known as the Warsaw Convention, this treaty is a major unilateral agreement among nations which, according to Article 1, governs the rights and responsibilities of carriers with respect to the international transportation for hire of persons, baggage or goods. While one of the central purposes of the Warsaw Convention was to limit the potential liability of a carrier by providing a maximum damage recovery of 125,000 gold francs or approximately $8,300.00 for personal injury or death arising out of an air disaster, this Argus of the aviation industry was not exacted without a price. In exchange for this protection, Article 17 was included to provide that

> [T]he carrier shall be liable for damage sustained in the event of the death or wounding of a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of operations of embarking or disembarking.

However, still possessing parental concern for the infant industry, the mother nations softened the harsh effect of Article 17 by also including in the treaty Articles 20(1) and 21:

### Article 20

> (1) The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures.

### Article 21

> If the carrier proves that the damage was caused by or contributed to by the negligence of the injured person the court may, in accordance with the provisions of its own law, exonerate the carrier wholly or partly from his liability.

Nurtured by industrial advancements in science and technology, between 1929 and 1965 the aviation industry matured into a comparatively safe, swift and profitable business. Disturbed by the fact that Warsaw's damage limitation had not also grown up with the industry, and faced with the economic reality of the passing years, in November of 1965 the United States gave the requisite notice of its denunciation of the Warsaw Convention. In doing so, it emphasized that its action was motivated solely by the low limits of liability to passengers. Department of State Press Release No. 268, Nov. 15, 1965.

Presented with this eventuality, the aviation industry decided "[t]o take arms against a sea of troubles." Shakespeare, *Hamlet*, Act III, scene 1. Accordingly, two days before the United States' denunciation was to become effective, an interim agreement was entered into among a substantial number of air carriers.[6] This agreement provided that the carriers were to file tariffs with the Civil Aeronautics Board which would raise the limits of liability and waive Warsaw's Article 20(1) defenses. The basic agreement, the tariff, see 31 Fed.Reg. 7302 No. 97, May 19, 1977, and the CAB order, see Agreement CAB 18900, CAB Order No. E–23680, are commonly known as the Montreal Agreement. With respect to the in-

---

**5.** While the United States has adhered to the original 1929 Warsaw Convention since 1933, and thereafter its carriers adopted the provisions of the 1966 Montreal Agreement, the United States did not adhere to the 1955 Hague Protocol that amended the Warsaw Convention. The Montreal Protocols, formerly known as the Guatemala City Protocol, are the most recent offspring of the Warsaw Convention. Said Protocols would amend the Warsaw Convention to provide a system of absolute liability for airlines engaged in international transportation, said liability to be limited to 100,000 Special Drawing Rights or approximately $117,000. While under the present Warsaw/Montreal system an airline is open to unlimited liability if the passenger can prove willful misconduct, see Art. 25 of the Warsaw Convention, under the proposed Montreal Protocols, the airline's limited liability is indefensible. The United States has signed said amendment and ratification thereof is apparently pending before the Senate. L. Kreindler, *Aviation Law: Demise of the Montreal Protocols*, N.Y.L.J., Aug. 18, 1978, at 1, col. 1.

**6.** Eastern Air Lines, Inc. is a party to the Montreal Agreement. I S. Speiser and C. Krause, *Aviation Tort Law* § 11:19, at 677 (1978).

crease in the damage limitation, the airlines agreed to enlarge the maximum limitation to $75,000 per passenger.

The airlines' waiver of the Article 20(1) defenses effected a change in the substantive approach to air carrier liability. While cases apparently unaffected by the Montreal Agreement speak in terms of a "presumption" of liability, *see, e. g., Benjamins v. British European Airways,* 572 F.2d 913, 917 (2d Cir. 1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (U.S. 1979), cases affected by the Montreal Agreement employ the language of absolute liability. To illustrate, in *Day v. Trans World Airlines, Inc.,* 528 F.2d 31 (2d Cir. 1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), the Second Circuit stated:

> Under the Montreal Agreement, *liability for injuries described by Article 17* of the Warsaw Convention *became absolute* and the maximum damages were increased to $75,000.

*Id.* at 33 (emphasis added). *Accord, Maugnie v. Compagnie Nationale Air France,* 549 F.2d 1256, 1259 (9th Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977).

Such a characterization of the nature of liability under the Montreal Agreement finds support in the Civil Aeronautics' Press Release regarding the Agreement:

> [B]y agreeing to forego certain defenses which they could raise under the terms of the Convention, the participating carriers are accepting the principle of *absolute liability,* i.e., liability without fault on the part of the airline.

CAB Press Release 66–61; 382–6031, May 13, 1966 (emphasis added). Furthermore, the State Department similarly remarked:

> Airlines in international travel will be *absolutely liable up to $75,000 per passenger regardless of any fault or negligence.* Recovery by those who need it most will thus be maximized and expedited.

Department of State Press Release No. 110, May 13, 1966 (emphasis added).

■ Thus, as the Warsaw/Montreal system stands now, unless a plaintiff wishes to seek unlimited recovery against the airline by virtue of its willful misconduct, *see* Art. 25 of the Warsaw Convention, or has contributed to the accident, *see id.* Art. 21, the need for litigation of the issue of the airline's liability for fault has been eliminated. This does not mean, however, that a plaintiff is automatically entitled to the receipt of a $75,000 check from the airline. To the contrary, he must still prove his damages and is entitled to recover the damages so proved up to the ceiling amount of $75,000.

Having highlighted the underpinnings of the Warsaw/Montreal system, the reasoning behind the grant of the autumn Warsaw/Montreal motions is now appropriate for discussion.

### D

*Reasoning Underlying the Grant of the Autumn Warsaw/Montreal Motions in the Non-Disputed Cases*

Cognizant of the character of the Warsaw/Montreal system, and there being no dispute regarding its applicability to the cases then at hand, when faced with the plaintiffs' requests on September 15, 1978, the Court opined that, as to liability and liability only, no question of fact existed. *See Rosman v. Trans World Airlines, Inc.,* 34 N.Y.2d 385, 392, 358 N.Y.S.2d 97, 103, 314 N.E.2d 848, 852 (1974). In so deciding, the term "liability" was employed in its purest sense, that is, as synonymous with fault. Indeed, this was the common usage of the term with respect to the Warsaw/Montreal system. *See Day v. Trans World Airlines, supra* at 33; CAB Press Release 66–61, *supra* ; Dept. of State Press Release No. 110, *supra.* In granting the requested relief, therefore, the Court passed only on the issue of fault. No judgment was passed on the issue of whether Eastern Air Lines was liable in damages to the plaintiffs, especially in light of Eastern's multifarious defenses of lack of capacity to sue, application of foreign law, and, in all but the *Behar, Hickey* and *Bright* cases, lack of authorization by decedents' next of kin. Seeing these defenses in a light more

closely related to the issue of liability for damages, the plaintiffs' motions for entry of judgments on the issue of liability for fault were granted. *See Rosman v. Trans World Airlines, Inc., supra* at 400, 358 N.Y. S.2d at 110, 314 N.E.2d at 857.

While this approach may be somewhat unorthodox in the face of Eastern's defenses, it must be remembered that this litigation is not the garden variety negligence case. The very definition of multidistrict litigation encompasses suits commenced in various federal courts throughout the nation and synthesized in one federal court. In granting the plaintiffs' motions, this Court did not scorn the individual personalities of Eastern's defenses in search of a procrustean solution of the issues before it. Rather, the complex nature of the litigation coupled with the myriad of particular problems attendant to Eastern's defenses were compelling factors in the decision to grant the plaintiffs' motions.

To illustrate, turning first to Eastern's defenses of lack of capacity to sue, it was realized that said defense contests a party's right to come into court and, consequently, is usually decided as a threshold issue. Nonetheless, the unique questions raised by the multidistrict character of this case prompted the Court to do otherwise.

■ Rule 17(b) of the Federal Rules of Civil Procedure provides that the question of a representative's capacity to sue is governed by the law of the state where the district court is situated. At first glance, it appears that New York law would therefore govern the capacity issue in all of these cases. However, in *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), the Supreme Court held otherwise. Ironically, the novel issue raised in *Van Dusen* resulted from the multitude of actions commenced after an air crash disaster in Boston. There, the Court was faced with the potential transfer of forty cases pending in a Pennsylvania Court, where the plaintiffs had capacity to sue, to a Massachusetts Court, where 100 similar actions were pending and where the Pennsylvania plaintiffs would not have capacity to sue.

In finding that a transfer would only result in a change of courtrooms, not a change of law, the Court stated:

> Since in this case the transferee district court must under § 1404 apply the laws of the State of the transferor district court, it follows in our view that Rule 17(b) must be interpreted similarly so that the capacity to sue will also be governed by the laws of the transferor State.

*Id.* at 639, 84 S.Ct. at 822.

■ At this point, mention must be made of the varied birthplaces of the suits at bar. The *Domangue, Mahfoud, Hickey* and *Windbourne* plaintiffs commenced their suits in Louisiana federal courts. Actions were commenced by the *Behar, Abbate, Daha* and *Alzozo* plaintiffs in the Southern District of New York. The *Bigio* suits are the only actions native to the Eastern District of New York. While the *Van Dusen* holding would not affect the New York born suits, it would affect the Louisiana actions. As to this group, *Van Dusen* dictates that Louisiana law would apply to the resolution of the capacity issue. Moreover, Eastern's defenses of lack of authorization of the decedents' next of kin appear to come within the breadth of Rule 17(b) and the rationale of *Van Dusen*. Consequently, Louisiana law would also apparently apply to the resolution of these defenses in the *Domangue, Mahfoud* and *Windbourne* cases. Since a remand of the Louisiana cases to their respective home districts was contemplated by the Court when it granted the September motions, in light of the foregoing, it appeared that judicial economy would best be furthered if the resolution of Eastern's capacity defenses was deferred until a later pre-damage trial stage or, if necessary, when a settlement was near.

Although New York law would determine the issue of capacity to sue in the *Behar, Abbate, Daha, Alzozo,* and two *Bigio* cases, it must be remembered that the Warsaw/Montreal judgments were directed solely to the issue of fault, not damages. Thus, Eastern was not thereby compelled to pay any damages to an improper plaintiff. Moreover, at the time the subject motions

were granted, neither party had informed the Court what law would govern the capacity issue. Although the actions are native New Yorkers, the respective decedents did not and their next of kin do not hail from New York. Having not been apprised of the relevant law, therefore, in September this Court was troubled by the possibility that New York law might refer to Venezuelan law in the *Behar* and *Bigio* cases, Syrian law in the *Alzozo* case and Italian law in the *Abbate* case for the resolution of the capacity issue. If this was so, to paraphrase Judge Friendly's remarks in the air crash case of *Nolan v. Transocean Air Lines*, 290 F.2d 904 (2d Cir.), *cert. denied*, 368 U.S. 901, 82 S.Ct. 177, 7 L.Ed.2d 96 (1961), *quoting* 276 F.2d 280, 281 (2d Cir. 1960), *vacated and remanded*, 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571 (1961), this Court opined that it would have to

> determine what the New York courts would think the [Italian, Venezuelan and Syrian] courts would think on an issue which neither has thought.

290 F.2d at 905. Such legal labyrinths, in the Court's view, were better left for resolution immediately before the commencement of separate damage trials or, if necessary, before settlement.

Eastern Air Lines, however, takes issue with this Court's approach to its capacity defenses. Meeting this reasoning head-on, Eastern claims its capacity defenses should have been determined prior to the grant of the plaintiffs' motions since, if proven, said defenses would mandate the dismissal of these actions. While some of the legal authority cited by Eastern gives the color of support to the view it advances, heed must be given to those cases which hold that where the defect may be cured by the substitution of the proper representative, dismissal is not warranted. Instead, such cases grant the plaintiff leave to amend his complaint. *See, e. g., St. Louis, San Francisco & Texas Railway Co. v. Seale*, 229 U.S. 156, 162, 33 S.Ct. 651, 57 L.Ed. 1129 (1913); *Marston v. American Employers Ins. Co.*, 439 F.2d 1035, 1041 (1st Cir. 1971); *Hunt v. Penn Central Transportation Co.*, 414 F.Supp. 1157, 1160 (W.D.Pa.1976); *Wein-*stein v. Medical Center Hosp. of Vermont, Inc., 358 F.Supp. 297, 299 (D.Vt.1973). *See also* cases cited in section VII, *infra*.

Of significance to those cases governed by New York law is the New York Court of Appeals' approach to the issue of a representative's capacity. In *Stolz v. New York Central Railroad*, 7 N.Y.2d 269, 196 N.Y. S.2d 969, 164 N.E.2d 849 (1959), much to the defendant's dismay, the Court of Appeals refused to sanction the dismissal of the plaintiff's wrongful death and survival actions with prejudice, notwithstanding her apparent lack of capacity to sue.

> By declaring plaintiff's appointment invalid and thereupon dismissing these actions, Trial Term appropriated to itself certain discretionary powers which the Legislature confided only in the Surrogate.
>
> . . . . .
>
> Here, the Trial Judge not only improperly exercised the discretion which the Legislature reposed in the Surrogate's Court but, indeed he virtually assumed there was no room for the exercise of any discretion. When at the close of trial he was alerted to the fact that there was a question as to the validity of plaintiff's appointment, he should have recognized that the Surrogate, with full knowledge of the facts, could have authorized the administratrix to continue these actions. It was, therefore, error to dismiss them.

*Id.* at 272–74, 196 N.Y.S.2d at 971–73, 164 N.E.2d at 850–51.

The *Stolz* Court additionally noted that a dismissal

> would consequently not prejudice [the administratrix] individually in any respect. It would, however, if the limitations period barred future actions, prejudice the rights of the ultimate beneficiaries and promote a windfall for defendant railroad.

*Id.* at 275, 196 N.Y.S.2d at 973, 164 N.E.2d at 852.

The reasoning underlying this decision is noteworthy, not only to the instant New York cases but also to the other capacity

defense cases as well. Of additional note is that the *Stolz* Court breathed life into the foregoing considerations by fashioning a procedure to be followed in representative capacity cases:

> A suspension of these [wrongful death and survival] actions, however, pending action by the Surrogate's Court—which may be the retention of plaintiff as administratrix or the appointment of a new administrator who could be substituted as party plaintiff in these suspended actions—within a reasonable time, would preserve the rights of the ultimate beneficiaries since these actions were timely brought in the first instance.

*Id.,* 196 N.Y.S.2d at 973, 164 N.E.2d at 852.

In light of the foregoing, this Court was not persuaded that Eastern's capacity defenses, even if proven, would mandate the dismissal of the actions at hand. This being so, when considered in conjunction with the additional reasoning behind the grant of the subject motions, the Court thought it best to defer ruling on the capacity questions until a later, more appropriate time.

■ Continuing on with the exploration of the unique problems presented by an immediate September resolution of Eastern's defenses and an explanation regarding the deferment of their resolution, Eastern's defense of the application of foreign law appears next on the agenda. At the outset, it must be noted that this defense is yet another mystery that remains untold in this case. Although Eastern asserted this as a second affirmative defense in each of the instant cases, and in doing so, assured that

> notice thereof will be given in accordance with Rule 44.1 of the F.R.C.P. upon ascertainment of applicable law[,]

to date, no specifics as to which foreign law or how its application would bar the prosecution of these actions has been forthcoming. No enlightenment was provided by Eastern in September when the Warsaw/Montreal motions were argued and, despite adequate opportunity to do so now, Eastern has still not come forward with any specifics or arguments that would warrant a vacatur of the Warsaw/Montreal judgments on the basis of this defense.

The decedents and next of kin in the *Windbourne, Domangue, Hickey* and *Bright* cases resided and reside in Louisiana. The *Windbourne* action concerns the husband of one decedent and the father of two decedents suing as plaintiff. In the *Domangue* case, plaintiff is the decedent's widow who apparently qualified in Terrebonne, Louisiana as the tutrix of the only children of the decedent. In the *Hickey* case, Edgar Bright and Mansuel Hickey were apparently appointed by Will as executors of the estate of Jane Bright Hickey. Similarly, in the *Bright* case, Edgar Bright was apparently appointed executor of the estate of Ethel Bright. While Eastern sets forth its defense of the application of foreign law in these cases with a thrust akin to athletic energy, it remains mute as to which law is to be applied and how its application bars the continuation of these actions.

Similarly, in the *Behar* case, Eastern merely points out that the decedent's home was Venezuela and concludes, therefore, that Venezuelan law must have some relevance to the action. The same opinion is attached to Eastern's observation that Edmund and Raphael Bigio were unmarried Venezuelan citizens who are survived by two brothers who are Israeli citizens and one sister who is a Swiss citizen. Again, Eastern concludes that foreign law must have some relevance regarding the *Daha, Alzozo* and *Mahfoud* cases, all of which concern Syrian decedents and beneficiaries. The only instance where Eastern is even vaguely specific regarding the application of foreign law is the *Abbate* case wherein it notes that a workman's compensation lien apparently exists under an unspecified Italian law against the proceeds of a damage recovery or settlement. By its own terms, however, the existence of such a lien would have no bearing on the issue of fault but only on the distribution of any damages.

Faced with a rainbow chain of neon signs blinking diverse nationalities, Eastern's observation that foreign law may apply is certainly not without merit. This Court, however, fails to see how this would affect

Eastern's liability for fault. According to *Benjamins v. British European Airways*, 572 F.2d 913 (2d Cir. 1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (U.S. 1979), the Warsaw Convention provides a universal source of a cause of action.[7] *Id.* at 919. Thus, it would appear that, this being a policy of international law, any application of foreign law could not obstruct access to this source. *Cf. Pearson v. Northeast Airlines, Inc.*, 309 F.2d 553 (2d Cir. 1962) (en banc), *cert. denied*, 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963); *Rosman v. Trans World Airlines, Inc.*, *supra*, at 398, 358 N.Y.S.2d at 108, 314 N.E.2d at 856. Rather, following along the channels of diplomacy, foreign laws could be employed to provide the details for the enforcement of this policy, such as providing guidelines to which relatives are to be the beneficiaries. *Cf. Kilberg v. Northeast Airlines, Inc.*, 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961). Thus, it appears that if foreign law is to be applied at all, it would be relevant only to issues which may arise in the event of a damage trial or settlement.

■ Even if this Court steps aside from the new era marked by *Benjamins* on the basis that *Benjamins'* new expression may be limited to those cases where jurisdiction is unavailable under 28 U.S.C. § 1332 (1976), *Benjamins, supra* at 919, and that such jurisdiction exists here, the application of foreign law nonetheless appears relevant only to the issue of damages.

Prior to *Benjamins*, it was consistently held that

the Warsaw system does not create any claim for relief but . . . merely (1) creates a presumption of liability if the otherwise applicable substantive law provides a claim for relief based on the injury alleged . . . .

*Husserl v. Swiss Air Transport Co., Ltd.*, 388 F.Supp. 1238, 1243 (S.D.N.Y.1975). *Accord, Noel v. Linea Areopostal Venezuela*, 247 F.2d 677 (2d Cir.) *cert. denied*, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); *Karfunkel v. Compagnie Nationale Air France*, 427 F.Supp. 971, 977 (S.D.N.Y. 1977); *Zousmer v. Canadian Pacific Airlines, Ltd.*, 307 F.Supp. 892, 899 (S.D.N.Y. 1969); *Komlos v. Compagnie Nationale Air France*, 111 F.Supp. 393, 401 (S.D.N.Y. 1952), *rev'd on other grounds*, 209 F.2d 436 (2d Cir. 1953), *cert. denied*, 348 U.S. 820, 75 S.Ct. 31, 99 L.Ed. 646 (1954). In determining which wrongful death statute provides a claim for relief in diversity actions, a federal court must apply the conflict of laws rule prevailing in the state in which the court sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ Earlier courts automatically applied New York's black letter lex loci rule and thus turned to the wrongful death statute of the place of the injury. *See, e. g., Komlos v. Compagnie Nationale Air France, supra*, 111 F.Supp. at 400; *Supine v. Compagnie Nationale Air France*, 100 F.Supp. 214, 216 (E.D.N.Y.1951); *Wyman v. Pan American Airways, Inc.*, 181 Misc. 963, 965–66, 43 N.Y.S.2d 420, 423 (Sup.Ct.1943), *aff'd mem.*, 267 App.Div. 947, 48 N.Y.S.2d 459, *aff'd mem.*, 293 N.Y. 878, 59 N.E.2d 785 (1944), *cert. denied*, 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432 (1945). *Cf. Pearson, supra* at 557; *Kilberg, supra*. However, New York Courts abandoned this approach and adopted in its stead Professor Brainard Currie's interest analysis technique to choice of law problems. *See, e. g., Long v. Pan American World Airways, Inc.*, 16 N.Y.2d 337, 266 N.Y.S.2d 513, 213 N.E.2d 796 (1965). In following this formula, a court essentially

---

**7.** Of note is that on August 14, 1953 to be effective August 22, 1953, Venezuela became a treaty member of the Warsaw Convention. See 4 U.S.T. 1493. Similarly, as of April 28, 1947 to be effective June 21, 1955, Syria became a treaty member. TIAS 3285. On October 13, 1931, effective October 31, 1931, Italy became a treaty member. 47 Stat. 2668. Denmark signed the treaty on December 16, 1944 which was effective for Denmark on September 29, 1945. 58 Stat. 1458. *See also* note foll. 49 U.S.C. § 1502 (1976). Greece is also a party to the treaty. I L.S. Kreindler, *Aviation Accident Law* § 11.01[3] at 11–5 (rev. ed. 1977). It further appears that all of these countries are signatories to the Hague Protocol. *Id.* at § 12.02[1] at 12–2.

analyzes the principles and policies underlying the apparently conflicting laws and the relationship they have to a particular case. After completing this inquiry, the court then applies the law of the jurisdiction with the paramount interest.

■ The implementation of this approach to the instant cases might well indicate that this Court's hands should stretch across the ocean, grasp the wrongful death statutes appearing in the decedents' varied homelands and employ them as the source of a cause of action. *Cf. Pearson, supra.* Even if such an exploration reveals that the relevant countries do not recognize a wrongful death cause of action,[8] it would appear that the wrongful act having occurred in New York gave rise to an enforceable cause of action here under the New York wrongful death statute. *See Husserl, supra* at 1243; *Komlos, supra* at 400; *Wyman, supra* 181 Misc. at 965–66, 43 N.Y.S.2d at 423.

■ However, with respect to Eastern's foreign law defense as applied to the question of the propriety of the Warsaw/Montreal liability judgments, the foregoing may be but unnecessary legal gymnastics. This is so because courts have consistently held that when a plaintiff covered by the Warsaw system commences suit in the United States, the substantive law regarding liability for fault and limitation of damages which must be applied is that of the Warsaw Convention. *See, e. g., Benjamins, supra* at 917; *Reed v. Wiser,* 555 F.2d 1079, 1092 (2d Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977); *Garcia v. Pan American Airlines, Inc.,* 269 App.Div. 287, 55 N.Y.S.2d 317 (2d Dept. 1945), *aff'd,* 295 N.Y. 852, 67 N.E.2d 257, *cert. denied,*

329 U.S. 741, 67 S.Ct. 79, 91 L.Ed. 640 (1946); *Berner v. United Airlines, Inc.,* 2 Misc.2d 260, 149 N.Y.S.2d 335 (Sup.Ct.), *aff'd,* 3 A.D.2d 9, 157 N.Y.S.2d 884 (1956), *aff'd,* 3 N.Y.2d 1003, 170 N.Y.S.2d 340, 147 N.E.2d 732 (1957); *Salamon v. Koninklijke Luchtvaart Maatschappij, N.V.,* 107 N.Y. S.2d 768 (Sup.Ct.1951), *aff'd mem.,* 281 App. Div. 965, 120 N.Y.S.2d 917 (1953).

Such a determination is mandated by the Warsaw Convention itself. Article 24 provides that any action "however founded" may only be brought "subject to" the "conditions and limits set out in [the] convention." *See Husserl v. Swiss Air Transport Co., supra* at 1251–52. Thus, as Judge Van Graafeiland noted in his dissenting opinion in *Benjamins,*

> no matter whether the action is founded in tort or contract, whether in domestic or foreign law, the limitations and conditions of the Convention will apply.

572 F.2d at 922.

Given this proposition, the question of Eastern's fault would not be determined by the application of foreign law. Accordingly, since the judgments at issue herein pertain only to the issue of Eastern's fault, it appeared that the application of foreign law would apply, if at all, only to the issues regarding damages. The Court, therefore, granted the plaintiffs' motions with said considerations in mind.

Of note at this juncture is that similar considerations persuaded the Court that any defect in the authorization to sue by the decedents' next of kin could also be adequately considered at a later time. Initially, it must be remembered that this defense was not interposed in the *Behar, Hickey*

---

8. Of note in this regard is that Louisiana law provides a cause of action for wrongful death. La.Civ.Code Ann., art. 2315 (West 1973). Of the foreign countries involved herein, Italy recognizes a cause of action for wrongful death. *See* Codice civile, art. 2043; Codice penale, art. 589. Similarly, the Court's research has disclosed that section 1196 of the Civil Code of Venezuela provides that a wrongdoer is liable for material and moral damages resulting from his tortious act. *See* I S. Speiser and C. Krause, *Aviation Tort Law* § 16:17, at 548 and § 16:46, at 590 (1978).

While the court was unable to ascertain whether Syrian law recognizes a cause of action for wrongful death, it appears that it may well have such a law. The *S'haria,* which contains the writings and teachings of the prophet Muhammad, incorporates the concept that if one kills or injures someone, he must pay blood money to the family of the decedent or injured person in order to compensate for said injuries. Furthermore, such a cause of action may exist due to the French influence on Syria which may have come directly or indirectly through the Lebanese influence on Syria.

and *Bright* cases. Of the eight remaining cases, a glaring inconsistency exists when this defense is aligned with the facts in the *Domangue* and *Windbourne* cases. The *Windbourne* plaintiff is the surviving husband and father of the three decedents concerned in that action, and the *Domangue* plaintiff is the widow of the decedent in that case. Thus, it appears that Eastern is alleging that the next of kin have not authorized themselves to commence these suits. As set forth in note 12, *infra*, a similar shadow of doubt is cast over the validity of this defense as it applies to the *Abbate, E. Bigio* and *R. Bigio* cases. Of significance with respect to the *Alzozo* and *Daha* cases is that this defense cannot be critical to said actions as these suits are in the process of being settled. For that matter, the pending settlements in these cases quell the initial vigor with which Eastern proffers its argument that the existence of all three of its defenses renders the Warsaw/Montreal judgments improper. With respect to the *Mahfoud* case, no comment regarding defective authorization can presently be made as the individual facts pertinent to this issue remain within the silent knowledge of the particular attorneys involved therein. However, since Eastern could not and, indeed, has not been prejudiced by the failure of this Court to resolve this issue in these as well as the other cases, for no action whatsoever can be taken on the disputed judgments until a damage trial ensues or a settlement is reached, the deferring of a ruling on Eastern's authorization defense until a later time appeared warranted.

The grant of the plaintiffs' motions in the face of the three defenses just discussed appeared consistent with the bifurcated path the MDL 227 litigation had been following. Since all the parties to this litigation chose to travel this path, it did not seem unreasonable to deny Eastern a detour from it on the eve of trial. Indeed, Eastern could have moved for the resolution of these matters a few years ago, but apparently decided not to do so. Moreover, considering that Eastern did not point to any injury sustained by virtue of these judgments, a postponement of the day of reckoning, as viewed from the bench on September 15, 1978, appeared proper.

E

*Disposition of the Plaintiffs' Rule
54(b) Motions*

■ Evident from the foregoing discussion is the absence of the Court's intent to deprive Eastern of its three defenses by the grant of the questioned Warsaw/Montreal motions. Notably demonstrated by Mr. Sincoff's remarks, the plaintiffs had no such intent either:

Unter [sic] the Montreal Agreement, Warsaw Convention, the airline is liable, without proof of negligence, and consequently these plaintiffs are entitled to have judgment on liability only entered against Eastern and by entry of such a judgment it cannot prejudice subsequent determinations as to any defenses they may have; damage limitation, interest, pre-judgment interest, capacity to sue or whatever they wish to raise.

Consequently, in order to eliminate these passengers from trial which hopefully will commence on Monday morning, we have asked that judgment be entered against Eastern only on liability only[,] leaving all issues for a later time.

(Sept. 15, 1978 Tr. at 23). Reiteration of this same idea occurred later in the argument:

Mr. Sincoff: If [Eastern Air Lines] has any defense, any defense, entry of judgment is not going to prejudice that defense.

(*Id.* at 30).

Also worthy of mention are the earlier remarks of September 11, 1978 that accompanied the verbal entry of liability judgments against the United States. In consenting to the entry of said judgments, Mr. Pangia, counsel for the United States, emphasized that said judgments were to be entered

with respect to liability only, and it is without prejudice to the Government's

right to contest jurisdiction, any matters of release, standing or capacity of any plaintiffs to sue or of any defense relating to damages.

(Sept. 11, 1978 Tr. at 12). Considering that said judgments pertained only to the issue of liability for fault, a tight similarity may be drawn between these and the Warsaw/Montreal judgments. Antedating the proceeding at issue by four days, Mr. Pangia's remarks color the background of intent behind the September 15th motions.

A study of the works of Pablo Picasso and Marc Chagall illustrates that, unlike photo realist Richard Estes, an artist may paint an image in such a manner so as to visibly distort its inherent reality. Eastern's litigious artistry of portraying the plaintiffs' Rule 54(b) motions as only being a scheme designed to cure or mitigate Eastern's alleged denial of due process, when viewed in conjunction with the intent visible in the record, does just this. Therefore, for all of the foregoing reasons, the *Windbourne* (76 C 237), *Domangue* (76 C 241), *Mahfoud* (76 C 457), *Behar* (76 C 250), *Abbate* (76 C 251), *Daha* (76 C 253), *Bright* (76 C 572), *Hickey* (76 C 573), *E. Bigio* (76 C 1023), *R. Bigio* (76 C 1024) and *Alzozo* (76 C 252) plaintiffs' motions to amend the liability judgments entered on their behalf against Eastern Air Lines pursuant to the Warsaw/Montreal system to include specific language to the effect that said judgments do not preclude Eastern from raising any defense it may have against the plaintiffs are granted. Said amendments are to refer explicitly to the three defenses discussed herein. Faithfulness to the record of September 15, 1978 further dictates that said orders are to include that said judgments do not preclude Eastern from raising the issue of interest or prejudgment interest or both.

## II

## PLAINTIFFS' REQUEST FOR A REAFFIRMANCE OF THE WARSAW/MONTREAL JUDGMENTS IN THE NON–DISPUTED REPRESENTATIVE CASES

A review of all the motion material fails to disclose the existence of legal or factual arguments that would warrant a departure from the reasoning underlying the grant of the disputed Warsaw/Montreal motions, see section I(C), *supra*, or a vacatur of the resulting liability judgments. Accordingly, the plaintiffs' motions in the *Windbourne* (76 C 237), *Domangue* (76 C 241), *Mahfoud* (76 C 457), *Behar* (76 C 250), *Abbate* (76 C 251), *Daha* (76 C 253), *Bright* (76 C 572), *Hickey* (76 C 573), *E. Bigio* (76 C 1023), *R. Bigio* (76 C 1024) and *Alzozo* (76 C 252) cases for orders reaffirming the grant of their motions for the entry of liability judgments against Eastern Air Lines on the basis of the Warsaw Convention and Montreal Agreement are granted.

With respect to this decision and the Rule 54(b) amendment decision, each plaintiff is to settle an order on notice to Eastern Air Lines in conformity with said decisions on or before noon of May 22, 1979.

## III

## PLAINTIFFS' REQUEST FOR A REAFFIRMANCE OF THE WARSAW/MONTREAL JUDGMENTS IN THE DISPUTED REPRESENTATIVE CASES

Like the plaintiffs in the non-disputed representative cases, all but one of the plaintiffs in the disputed representative cases approach the bench for a reaffirmance of the grant of their Warsaw/Montreal motions.[9] To assist in the understanding of

---

9. Mr. William Jennings, one of the parties claiming the personal representative title in the *Manias* and *Merkouris* cases, does not explicitly join in this application of the Public Administrator, the other party claiming the personal representative title in these cases. While Mr. Jennings urges this Court to find that it lacks subject matter jurisdiction, an issue which is discussed in section V, *infra*, he does not set forth his position regarding the Warsaw/Montreal judgments entered against Eastern in the *Manias* and *Merkouris* cases. However, this Court does not construe Mr. Jennings' silence as opposition to the entry of these judgments as, despite his contention of lack of subject matter jurisdiction, Mr. Jennings explicitly re-

these motions, it is appropriate, once again, to reminisce and to dig among the bones of past facts.

After Eastern Air Lines' motion to consolidate the separate actions commenced by various people on behalf of one decedent's next of kin was granted, the Court was left with eight distinct cases wherein two plaintiffs were competing for the title of personal representative. Only seven of these cases, *Priniotakis, Alexandridis, Hadzis, Wolfgang Hansen, Peter Hansen, Merkouris* and *Manias,* are of present concern. The eighth case, *Pefanis,* is apparently not governed by the Warsaw/Montreal system.

In each of these seven cases, Tierney O'Rourke stands in one corner of the ring as the Public Administrator of Queens.[10] In the *Wolfgang Hansen* bout, Karin Marianne Hansen and in the *Peter Schmidt Hansen* bout, Mary Hansen stand in the opposite corner as his opponent. In the match for the representative title in the *Priniotakis, Alexandridis* and *Hadzis* cases, Mr. O'Rourke's rival is Mr. Cappiello, who was issued Letters of Administration in Pennsylvania. Standing in the opposite corner in the *Manias* and *Merkouris* title fights is Mr. Jennings, who was apparently issued Letters of Administration of these estates in California.

Mr. O'Rourke initially moved for entry of judgments in these cases pursuant to the Warsaw/Montreal system in September of 1978. Troubled by the fact that Mr. O'Rourke's title challengers did not join in his motion, the Court deferred ruling on these applications pending notice to and an opportunity to be heard by Mr. O'Rourke's

respective opponents and Eastern Air Lines. Grasping the opportunity thus afforded to them, the Hansen pugilists and Mr. Jennings initially opposed the grant of the requested relief while Mr. Cappiello supported it. However, in keeping with the ambiance of this litigation, not surprisingly, on October 27, 1978 the Hansen contestants and Mr. Jennings retreated from their earlier positions and joined wholeheartedly in the O'Rourke applications.

After due deliberation, on December 1, 1978, this Court rendered an oral decision granting the Warsaw/Montreal motions on the condition that the resulting judgments be entered without prejudice to Eastern's rights to challenge the plaintiffs' capacity to sue, to question whether authorization to sue had been given by the decedents' next of kin and to raise any other defenses Eastern may have. It was further ordered that said judgments were to contain an explicit provision prohibiting the commencement of damage trials or the effectuation of settlements until the issue of representation had been resolved by the Queens Surrogate's Court. Additionally, this Court reaffirmed its order of October 21, 1976 which found that the proper arena for the representative title match was the Queens County Surrogate's Court and, accordingly, directed the parties to commence the title fight in that ring.

When the Court granted these disputed plaintiffs' motions, the considerations deemed compelling in the grant of the non-disputed plaintiffs' Warsaw/Montreal motions were found to be equally compelling and applicable to the disputed cases.[11]

---

quested the entry of these judgments on October 27, 1978.

**10.** Tierney O'Rourke resigned as Public Administrator of Queens County on May 31, 1977, and George L. Memmen was appointed successor Public Administrator. This succession, however, does not jeopardize the validity of the Letters issued to Mr. O'Rourke. Under section 1111 of the Surrogate's Court Procedure Act, a successor public administrator "upon qualifying shall succeed at once to all the rights, duties and powers of his predecessor in office without the reissuance of letters to him." However, since no formal substitution of Mr.

Memmen for Mr. O'Rourke as plaintiff was ever effected, and since the parties to the litigation as well as the Court have continued to refer to the Public Administrator as Mr. O'Rourke, the Court will continue to do so herein. However, any reference to Mr. O'Rourke necessarily includes a reference to Mr. Memmen.

**11.** For example, with respect to Eastern's claim that the application of foreign law would apply to bar the prosecution of the subject actions, it appears that Peter Hansen and Wolfgang Hansen were citizens of Denmark who are survived

Since these considerations have been set out at length in section I(C), *supra*, the Court will not outsing itself by reiterating them now.

Of note to the disputed cases, however, is that Eastern was given more than ample time to oppose the Warsaw/Montreal motions. Thus, a claim by Eastern regarding these cases that it has been denied procedural due process would be as infertile as trying to lay a lawn on a sidewalk. Of additional note is that said judgments explicitly contain a guardian clause that protects Eastern's right to raise its defenses and prohibits the commencement of damage trials or the effectuation of settlements until the representation dispute is resolved. Eastern's rights, therefore, were not prejudiced, and it was protected from being forced to proceed at its peril with the trial or settlement of an action with one representative who might later be found not to be the proper representative. In light of this clause, the absence of any dispute regarding the applicability of the Warsaw/Montreal system, and this Court's opinion that Eastern's defenses were more appropriate for resolution at the pre-settlement or pre-damage trial stage, the plaintiffs' motions as conditioned were granted. No new facts or law having been unearthed which would mandate a change of this position, the instant motions for a reaffirmance of the grant of the Warsaw/Montreal motions in the *Peter Schmidt Hansen* cases (76 C 255), the *Wolfgang Hansen* cases (76 C 256), the *Merkouris* cases (76 C 258), the *Priniotakis* cases (76 C 260), the *Alexandridis* cases (76 C 265), the *Manias* cases (76 C 1022) and the *Hadzis* cases (76 C 1025) are granted.

Both representatives in each of these consolidated cases are to join in one order which is to be settled on notice to Eastern Air Lines in accordance with this decision and which is to be submitted under the respective consolidated docket numbers on or before noon of May 22, 1979.

## IV

### CAPACITY TO SUE IN THE R. BIGIO, E. BIGIO, ALZOZO, DAHA, BEHAR AND ABBATE CASES

■ The plaintiffs in the *Raphael Bigio, Edmund Bigio, Alzozo, Daha, Behar* and *Abbate* cases, all of which are non-disputed representative cases, approach the bench with the additional request that this Court find as a matter of law that Tierney O'Rourke, the plaintiff in each case, has capacity to sue. Despite the fact that Eastern directly attacks Mr. O'Rourke's capacity by way of an affirmative defense in its answer, it nevertheless opposes a determination of this issue at this time. Although it cites no authority in support of its proposition, Eastern claims that this Court must vacate the Warsaw/Montreal judgments and start anew. Should the Court abide by this procedure, Eastern claims that it needs additional time to complete discovery on the capacity issue, notwithstanding the fact that the subject cases are approximately three years old.

Despite the energy with which Eastern proffers its arguments, a closer analysis reveals its position to be somewhat blind and indefinite. As has already been noted in section I(B), *supra*, this Court possesses the power to amend the judgments at issue under Rule 54(b) of the Federal Rules of Civil Procedure. Moreover, Eastern's proposal that it be given additional time to

by Danish next of kin. The decedents Manias, Merkouris, Priniotakis, Alexandridis and Hazdis were citizens of Greece who apparently are survived by Greek next of kin. As was noted extensively in section I(C), *supra*, such varied nationalities may be relevant to the distribution of damages, but considering the applicability of the Warsaw/Montreal system, foreign law would be irrelevant to the issue of fault. Moreover, it appears that Greece recognizes an action for wrongful death in its civil code. *See* I S. Speiser and C. Krause, *Aviation Tort Law*

§ 16:17, at 547 (1978). While Denmark does not appear to have a complete codification of its laws, it does appear to recognize an action for wrongful death. *See id.* at § 16:20, at 554 n. 64. In fact, it appears that the right to sue in Denmark does not turn on the characterization of a wrong as "actionable," which is the case in English and Roman Law. Rather, any human interest fit for legal protection is apparently a sueable interest in the Denmark courts. *See* VII *Martindale Hubbell Law Directory*, pt. IV, at 3465 (1979).

respond to this issue does not persuade this Court to further delay the proceedings in these cases. Indeed, Eastern has been given more than enough time to come forward with specific reasons why Mr. O'Rourke as administrator in each case lacks capacity to sue. Rather than seizing such an opportunity by responding with legal and factual authority sustaining its position, Eastern has come forward with only vague generalities.[12] In light of the applicable law, this is not enough.

An appropriate launching point for a discussion of whether Mr. O'Rourke has capac-

ity to sue in each of these cases is Rule 17(b) of the Federal Rules of Civil Procedure. As has been noted, this Rule provides by process of elimination that a representative's capacity to sue is to be determined by the state in which the district court sits. Since all of these cases were commenced in a district court in New York, New York law regarding capacity to sue would govern. *Cf. Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

The New York law of significance to the determination of the capacity issue is found

**12.** Eastern Air Lines submitted separate affidavits in each case in opposition to each plaintiff's motion for a Rule 54(b) amendment. Additionally, in the *Abbate, Raphael Bigio, Edmund Bigio* and *Behar* cases, Eastern submitted a further affidavit apparently in opposition to these plaintiffs' requests that this Court find that they have capacity to sue. While the *Daha* and *Alzozo* plaintiffs also ask for this relief, no further affidavit was submitted by Eastern addressing these requests. Thus, in the *Daha* and *Alzozo* cases, Eastern has only summarily stated that Mr. O'Rourke lacks capacity to sue. Absolutely no facts bearing on this conclusion have been offered in support of it.

Turning to the remaining cases, in *Abbate,* Eastern does not specifically attack Mr. O'Rourke's lack of capacity as an administrator. Rather, with respect to its defense of lack of authorization by decedent's next of kin, Eastern notes certain answers to damage interrogatories dated May 5, 1976 wherein it was stated that the next of kin had not approved of Mr. O'Rourke's appointment. The implication found in this statement, however, is belied by the plaintiff's further opposing affidavit wherein it was stated that after this 1976 deposition, such consent was indeed given.

A similar argument is advanced by Eastern in the *Bigio* cases and, in support thereof, Eastern cites answers to interrogatories dated February 7, 1978 for the proposition that Mr. O'Rourke lacks authority. However, this, too, is controverted by a further affidavit stating that Eastern knows the *Bigio* plaintiffs' attorney in these actions was retained by Mr. Reich, the attorney for the decedents' next of kin, to continue these actions.

However, both Eastern's reliance on these answers to interrogatories and plaintiffs' rebuttal appears irrelevant to the validity of Mr. O'Rourke's appointment as administrator in these cases and his concomitant power to prosecute these actions. *See* §§ 5–4.1, 11–3.3(b) and 1–2.13, N.Y.Est., Powers & Trusts Law (McKinney 1967). Of further note to Eastern's claim of lack of authorization for said appoint-

ment is the first sentence of section 1002 of the Surrogate's Court Procedure Act (McKinney 1967):

Any person interested in the estate of an intestate or of a person alleged to be deceased or any person to whose appointment as administrator all distributees consent pursuant to 1001 *or a public administrator . . .* may present a petition to the court having jurisdiction praying for a decree granting letters of administration to him . . . .

Such language indicating that no consent is needed for the appointment of the Public Administrator is further buttressed by section 1003 of the Surrogate's Court Procedure Act which provides, in part:

Every eligible distributee who has a right to administration prior or equal to that of the petitioner and who has not renounced must be served with process upon an application for letters of administration. . . . When the petitioner is a public administrator . . . process shall issue only to such incompetent domiciliary distributees whose names and addresses are known to him. The court may dispense with the issuance and service of process upon non-domiciliaries.

Of interest, however, is despite the apparent lack of any need to notify the non-domiciliary alien next of kin of the Public Administrator's appointment, according to the answers to interrogatories dated August 17, 1976 in the *Daha* case, dated July 30, 1976 in the *Alzozo* case, and dated August 17, 1976 in the *Edmund Bigio* case, letters were sent by Mr. O'Rourke to each of these decedent's next of kin apprising them of his appointment. Said letters were sent to the relatives whose names and addresses had been provided to Mr. O'Rourke by Eastern. A similar letter was also apparently sent to the next of kin of the decedent Behar. Of final note is that any question regarding authorization to sue in any of the cases at issue apparently could be put to final rest by submission of an affidavit to this effect by the respective decedents' next of kin in accordance with the procedure set forth in note 20, *infra.*

in the Surrogate's Court Procedure Act (hereinafter "S.C.P.A."). That part of section 203 of the S.C.P.A pertaining to subject matter jurisdiction provides:

> The [Surrogate's] court obtains jurisdiction in every case to make a decree or other determination by the existence of the jurisdictional facts prescribed by statute.
>
> The jurisdiction of the court is exercised by the commencement of a proceeding in the court. . . .

A refinement of the Surrogate's jurisdiction is found in section 206(2) of the S.C.P.A. which grants jurisdiction to the Surrogate's Court over the estate of

> any non-domiciliary of the state who
> (a) left property within that county and no other, or
> (b) left personal property which since his death, disappearance or interment has come into that county and no other and remains unadministered, or
> (c) left a cause of action against a domiciliary of that county for damages for wrongful death of the decedent and who left no property in any other county.

In order for one to have the power to administer the estate of an intestate, he must petition the Surrogate's Court and thereafter be issued Letters of Administration. Recognizing the strong psychosocial ties of the family, section 1001 of the S.C.P.A. enumerates a priority for the issuance of Letters, commencing with the family member most intimately associated with the decedent and spiraling down to more distant relatives. However, a condition precedent to the issuance of Letters is that the petitioner be eligible to receive them. Notably, section 707 of the S.C.P.A states that a non-domiciliary alien is ineligible to receive Letters,[13] but for an instance not relevant to this discussion.[14]

In light of such a limitation, section 1001(8)(a) of the S.C.P.A. provides:

> When letters are not granted under the foregoing [priority] provisions and an appointment is not made by consent as hereinbefore provided then letters of administration shall be granted in the following order:
>
> (a) to the public administrator . . .[15]

13. While a non-domiciliary alien may not be issued Letters of Administration in New York, he can, however, "maintain a wrongful death action in this state upon the strength of his original letters." *Wiener v. Specific Pharmaceuticals*, 298 N.Y. 346, 352, 83 N.E.2d 673, 676 (1949). *See generally Moore-McCormack Lines v. McMahon*, 235 F.2d 142, 148 (2d Cir. 1956); *Kruskal v. United States*, 178 F.2d 738, 740 (2d Cir. 1950). In the instant matter, it appears that Luigi Gabay, a non-domiciliary alien, was appointed administrator of the Behar estate in Venezuela on October 19, 1975. No Letters or similar certificate of authority, however, were submitted to this Court as evidence of this appointment. Furthermore, while New York law recognizes the right of a foreign administrator to maintain a wrongful death action in New York without the issuance of Ancillary Letters, this Court does not know, and indeed no party has briefed the point, whether a Venezuelan Administrator has the power to commence a wrongful death action. However, since Mr. Gabay does not dispute Mr. O'Rourke's capacity to commence the instant action, but instead, apparently concedes this point, the existence or nonexistence of Letters issued to Mr. Gabay and his power to prosecute this action is not an issue herein. Mr. O'Rourke is the only representative that the Court knows was designated as administrator.

14. Section 706, subd. 1(c) of the Surrogate's Court Procedure Act states that Letters may not issue to a non-domiciliary alien except in the case of a foreign guardian as prescribed in section 1716(4) of the Surrogate's Court Procedure Act. Despite this ineligibility to be issued Letters, under section 1001(7) of the Surrogate's Court Procedure Act, a non-domiciliary alien may consent to the appointment of a trust company or other corporate fiduciary, and the Surrogate can issue such Letters upon the consent of all to such an appointment.

15. The "consent" provision referred to in section 1001(8) of the Surrogate's Court Procedure Act refers to subsection 6 of that section. Subsection 6 permits the issuance of Letters to a distributee with an inferior right or to a non-distributee upon the consent of those entitled to share in the estate. A caveat to such consent, however, is that all distributees be eligible to act as administrators. If one is ineligible to act, Letters cannot be granted by the consent method.

Accordingly, sections 1002 and 1116 of the S.C.P.A. authorize the Public Administration to petition for and receive Letters, and, in the instant matters, that is precisely what Mr. O'Rourke did.

Specifically, on August 8, 1975, Mr. O'Rourke petitioned the Queens County Surrogate's Court for the issuance of Letters of Administration of the estates of Dorio Abbate, Ahmed Alzozo, Edmund Bigio, Raphael Bigio, and Lucienne Behar. Three days later, he petitioned the Court for Letters of the estate of Omar Daha. Thereafter, on August 12, 1975, Letters of Administration of the estates of Behar, Abbate, Alzozo, E. Bigio and R. Bigio were issued to Mr. O'Rourke by the Surrogate of Queens County. Letters of Administration of the estate of Daha were issued on August 13, 1975.

In asserting that Mr. O'Rourke lacks capacity to sue, Eastern directly attacks the validity of the foregoing letters which provide the foundation for Mr. O'Rourke's title as plaintiff in these actions. *See* N.Y.Est., Powers & Trusts Law § 5–4.1 (McKinney 1967). This onslaught, however, is defeated by the watchfulness of the law's stronger army. As Judge Clark cogently noted many years ago in *Hart v. Mutual Benefit Life Ins. Co.*, 166 F.2d 891 (2d Cir.), *cert. denied*, 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 389 (1948):

> There seems an even more basic ground upon which this decision should go against the plaintiffs. For they are attacking collaterally and without adducing any adequate reason a decree of court which we must accept as at least presumptively, if not conclusively, immune to such an attack. This, it seems to us, is made clear by the several pertinent provisions of the state statutes . . . .

*Id.* at 894–95.

■ Today, such pertinent provisions are found in sections 703 and 204 of the S.C.P.A. Section 703 provides:

> [L]etters granted by the court are conclusive evidence of the authority of the persons to whom they are granted until the decree granting them is reversed or modified upon appeal or the letters are suspended, modified or revoked by the court granting them.

Of even greater significance to the instant issue, however, is section 204's unequivocal statement:

> Where the jurisdiction of the court to make a decree or other determination is drawn in question collaterally, *the jurisdiction is presumptively and in the absence of fraud or collusion, conclusively established* by an allegation of the jurisdictional facts contained in a verified pleading. . . .

N.Y.Surr.Ct.Proc.Act § 204 (McKinney 1967) (emphasis added). Significantly, according to Professor Siegel, section 204 was enacted to prevent from happening exactly that which Eastern wants to happen here.

> The area in which the section most frequently functions is that concerned with the appointment of a representative of the estate. Once appointed, his duties may entail litigation, and in that litigation his authority to represent the estate may come in issue. *If the petition in the surrogate's court* proceeding in which he was appointed *alleged facts which (as a jurisdictional matter) authorized the appointment, section 204 aims at preventing the other parties to the litigation* in which the representative is now involved *from collaterally attacking the appointment* (and thus defeating the litigation upon the ground that the representative has no authority to represent the estate).

David D. Siegel, McKinney's Practice Commentary, N.Y.Surr.Ct.Proc.Act § 204 (McKinney 1967) (emphasis added).

An examination of the instant petitions reveals an allegation of jurisdictional facts supporting Mr. O'Rourke's appointments. *See* N.Y.Surr.Ct.Proc.Act §§ 206(2) and 1001(8)(a) (McKinney 1967). Thus, the Surrogate's jurisdiction to issue the Letters and the concomitant validity of the Letters is presumptively established. This does not end the inquiry, however, for Eastern Air Lines has not asserted that any fraud or collusion existed in obtaining these Letters. Thus, the Surrogate's jurisdiction has been

conclusively established, see N.Y.Surr.Ct. Proc.Act § 204, supra, and the Letters issued are conclusive evidence of Mr. O'Rourke's authority to prosecute the instant cases, see N.Y.Surr.Ct.Proc.Act § 703, supra. Accord, Mecom v. Fitzsimmons Drilling Co., 284 U.S. 183, 189, 52 S.Ct. 84, 76 L.Ed. 233 (1931); O'Rourke v. Merry Queen Transfer Corp., 370 F.2d 781, 783 (2d Cir. 1967); Hoskins v. Eastern Air Lines, Inc., 265 F.Supp. 842, 845 (E.D.N.Y.1967); Meehan v. Cent. R. R. Co. of N. J., 181 F.Supp. 594, 603 (S.D.N.Y.1960); Stolz v. N. Y. Central R. R., supra at 274–75, 196 N.Y. S.2d at 973, 164 N.E.2d at 851.

In light of the foregoing, this Court finds that Mr. O'Rourke possesses capacity to sue as plaintiff in the R. Bigio (76 C 1024), E. Bigio (76 C 1023), Alzozo (76 C 252), Daha (76 C 253), Behar (76 C 250) and Abbate (76 C 251) cases.

While not intending to confound confusion in a litigation already replete with complexities, this finding of Mr. O'Rourke's capacity to sue in these cases necessarily bears relevance to the Court's earlier decision permitting these plaintiffs to amend their Warsaw/Montreal judgments. Nonetheless, the finding that these plaintiffs' September judgments were not intended to preclude Eastern Air Lines from later questioning Mr. O'Rourke's capacity to sue remains a valid statement. However, having presently granted Eastern the opportunity to come forward with specifics in support of Mr. O'Rourke's lack of capacity to sue, it having failed to do so, and the law being clear on this issue, no ground exists to further postpone the instant ruling.

In an attempt to clarify this turn of events, with respect to the six cases involved herein, the separate orders to be submitted in conformity with the Court's decision on the Rule 54(b) motion by these plaintiffs are also to note that while the Warsaw/Montreal judgments entered against Eastern did not preclude it from raising the defense of lack of capacity to sue, the Court's subsequent finding that Mr. O'Rourke possesses capacity to sue precludes Eastern from raising this defense in these six cases. Each order is to be settled on notice to Eastern Air Lines on or before noon of May 22, 1979.

## V

### WILLIAM JENNINGS' REQUEST FOR A FINDING THAT THIS COURT LACKS SUBJECT MATTER JURISDICTION IN THE MANIAS AND MERKOURIS CASES COMMENCED BY O'ROURKE

As has already been seen, Mr. Jennings stands in the corner opposite Mr. O'Rourke as challenger for the title of representative in the Manias and Merkouris actions. By way of his response to Eastern's motion for section 1292(b) certifications of the Manias and Merkouris Warsaw/Montreal judgments, Mr. Jennings once again contests the validity of Mr. O'Rourke's Letters of Administration in these cases. In doing so, he argues that since Mr. O'Rourke's appointment is improper and invalid, he lacks capacity to sue, and, therefore, no case and controversy exists between Eastern and Mr. O'Rourke. This alleged contravention of Article III, section 2 of the United States Constitution and 28 U.S.C. § 1332 (1976), Mr. Jennings argues, leaves this Court without subject matter jurisdiction in the O'Rourke cases.

This is not the first time Mr. Jennings has attacked the validity of Mr. O'Rourke's Letters, has claimed they are invalid, and has argued that this Court lacks subject matter jurisdiction. Nor is it the second time he has done so. Mr. Jennings first came forward with such a challenge to Mr. O'Rourke's title in the fall of 1976. By Memorandum and Order dated October 21, 1976, he was directed to present the question of the validity of Mr. O'Rourke's Letters and his concomitant authority to sue thereunder to the Queens County Surrogate's Court. Rather than comply with this directive, Mr. Jennings bided his time until October of 1978 when he again urged this Court to find Mr. O'Rourke's appointment to be improper. Once more, he was directed to present this question to the Queens'

Surrogate. Still, men turn deaf ears to those words not wanted to be heard. Accordingly, Mr. Jennings returns again to this Court, advancing the same arguments and seeking the same relief.

Such a tautological history gives rise to the inclination to summarily dismiss Mr. Jennings' request under the doctrine of law of the case. Indeed,

> where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.

*Zdanok v. Glidden Co., Durkee Famous Food Div.*, 327 F.2d 944, 953 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). *See Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed.2d 1152 (1912); *Higgins v. Calif. Prune & Apricot Grower, Inc.*, 3 F.2d 896, 898 (2d Cir. 1924); *Perma Research & Development Co. v. Singer Co.*, 308 F.Supp. 743, 746 (S.D.N.Y.1970); *Ross Products, Inc. v. New York Merchandise Co.*, 242 F.Supp. 878, 879 (S.D.N.Y.1965). Nonetheless, in order to clarify any misunderstanding which may exist regarding the Court's prior rulings, and to prevent Mr. Jennings from continuing in his efforts to shadow box in this Court, the merits of Mr. Jennings' motion will be discussed for the last time.

Mr. Jennings' arguments flow from the proposition that Mr. O'Rourke's alleged lack of capacity deprives this Court of subject matter jurisdiction. While earlier cases provide a blush of validity to this theory, *see, e. g., Clemente Engineering Co. v. De-Liso Construction Co.*, 53 F.Supp. 434, 435 (D.Conn.1944); *Pasos v. Eastern S. S. Co.*, 9 F.R.D. 279, 281 (D.Del.1949), later cases have expressly rejected the notion that lack of capacity rises to the level of a subject matter jurisdictional defect, *see, e. g., Summers v. Interstate Tractor & Equipment Co.*, 466 F.2d 42, 50 (9th Cir. 1972); *Brown v. Keller*, 274 F.2d 779, 780 (6th Cir.), *cert. denied*, 363 U.S. 828, 80 S.Ct. 1599, 4 L.Ed.2d 1523 (1960).

Further inquiry into this issue reveals the Supreme Court has indicated acceptance of the non-jurisdictional view. In *Hoffman v. Blaski*, 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960), the Court held that a case could not be transferred to a district court which would not originally have had venue and jurisdiction over the action. *Id.* at 343–44, 80 S.Ct. 1084. Yet in *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), when faced with the problem of the plaintiff's lack of capacity in the transferee court, the transfer of these actions was upheld upon the theory that the law of the transferor court would govern the capacity issue. *Id.* at 639, 84 S.Ct. 805. In contrast, if such a transfer would break diversity of citizenship, this jurisdictional defect could not be remedied by noting that the requisite diversity existed in the transferor court. Unlike the capacity issue, this latter flaw would render the transferee court powerless to hear the merits of the case.

Rule 17(b) of the Federal Rules of Civil Procedure further bolsters the nonjurisdictional defect theory as it is explicitly qualified by Rule 9(a) of the Federal Rules of Civil Procedure. According to the directives of Rule 9(a), the issue of lack of capacity to sue must be raised by a specific negative averment. Needless to say, this need not be done in an instance where the Court lacks subject matter jurisdiction. It is hornbook law that such a defect may be raised at any time, by the parties or the court, despite the absence of a statement to this effect in the pleadings. Thus, unlike a defect in personal jurisdiction which must be raised by a specific negative averment or it will be deemed to be waived, Fed.R.Civ.P. 12(h)(1), lack of subject matter jurisdiction may never be waived.

Applying such legal prescripts to the capacity issue, courts have interpreted the interplay between Rule 17 and Rule 9(a) to denote that, if not raised by a specific negative averment, the defense of lack of capacity is thereby waived. *Landry v. Two R. Drilling Co.*, 511 F.2d 138, 141 n.2 (5th Cir. 1975); *Summer v. Interstate Tractor & Equipment Co.*, *supra* at 50; *Marston v. American Employers Ins. Co.*, 439 F.2d 1035, 1041 (1st Cir. 1971); *Plumbers Local*

*U. N. 519 Miami, Fla. v. Service Plbg. Co., Inc.*, 401 F.Supp. 1008, 1011 (C.D.Cal.1975); *Volkswagenwerk Aktiengesellschaft v. Dreer*, 253 F.Supp. 37, 43 (E.D.Pa.1966); *Montellier v. United States*, 202 F.Supp. 384, 390 (E.D.N.Y.), *aff'd on other grounds*, 315 F.2d 180 (2d Cir. 1962). If lack of capacity is a waivable defense, then it cannot be said to be a defense going to a court's subject matter jurisdiction. Applied to the instant representative matters, the practical fairness of this conclusion stands clear, for the ultimate beneficiaries, rather than the nominal representatives, would be prejudiced by a dismissal of the actions for want of subject matter jurisdiction. *Cf. Stolz, supra* at 275, 196 N.Y.S.2d at 973, 164 N.E.2d at 852.

However, even if a contrary conclusion was reached on this issue, it cannot be said that Mr. O'Rourke lacks capacity to sue. Recollect that Mr. O'Rourke was issued Letters of Administration in the estates of Manias and Merkouris by the Queens County Surrogate's Court and that the holding of said Letters entitles him to prosecute the instant actions. See section IV, *supra.* Despite Mr. Jennings' claim that the issuance of said Letters was improper, under New York law, the Public Administrator has the right to petition for the issuance of Letters, N.Y.Surr.Ct.Proc.Act § 1002 (McKinney 1967), to be granted said Letters, N.Y.Surr. Ct.Proc.Act §§ 1116, 1001(8)(A) (McKinney 1967), and once said Letters issue to him, New York law deems them

> conclusive evidence of the authority of the persons to whom they are granted until the decree granting them is reversed or modified upon appeal or the letters are suspended, modified or revoked by the court granting them[,]

N.Y.Surr.Ct.Proc.Act § 703 (McKinney 1967).

■ Essentially, Mr. Jennings is asking this Court to declare Mr. O'Rourke's Letters to be invalid and to excuse him from proceeding with the prosecution of the *Manias* and *Merkouris* cases. However, not being the Court that issued the questioned Letters, under section 703 of the S.C.P.A., this Court lacks the power to declare them invalid and revoke them. *See Stolz, supra* at

272–74, 196 N.Y.S.2d at 971–73, 164 N.E.2d at 850–51. Moreover, this Court also lacks the power to excuse Mr. O'Rourke from acting as administrator in prosecuting these actions, for a

> public administrator or county treasurer may not renounce his right and *may only be excused from acting upon his motion duly made and an order made and entered thereupon by the [Surrogate's] court.*

N.Y.Surr.Ct.Proc.Act § 1003(3) (McKinney 1967) (emphasis added).

At this juncture, heed must be given to Judge Friendly's remarks in *Republic of Iraq v. First National City Bank*, 353 F.2d 47 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966):

> Although the general language [of 28 U.S.C. § 1332] does not grant jurisdiction to probate a will or administer an estate, it has been established by a long series of decisions "that federal courts of equity have jurisdiction to entertain suits 'in favor of creditors, legatees and heirs' and other claimants against a decedent's estate 'to establish their claims' *so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate* or control of the property in the custody of the state court."

*Id.* at 50, *quoting Markham v. Allen*, 326 U.S. 490, 494, 66 S.Ct. 296, 90 L.Ed. 256 (1946) and *Waterman v. Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33, 43, 30 S.Ct. 10, 54 L.Ed. 80 (1909) (emphasis added). As noted by Judge Wyatt, the reason for a federal court's reticence to rule in this area is

> partly historical in that equity jurisdiction conferred on federal courts in the Judiciary Act of 1789 was that of the English Court of Chancery at that time and the jurisdiction of the English Court of Chancery did not extend to probate matters . . . . The reason must also be to promote "the harmonious cooperation of federal and state tribunals."

*Rousseau v. United States Trust Co. of N. Y.*, 422 F.Supp. 447, 456 (S.D.N.Y.1976), *quoting Princess Lida of Thurn and Taxis v.*

*Thompson*, 305 U.S. 456, 466, 59 S.Ct. 275, 83 L.Ed. 285 (1939).

The *Markham* Court permitted the suit therein to proceed because

> [t]he effect of the judgment was to leave undisturbed the orderly administration of the decedent's estate in the state probate court.

*Markham, supra* 326 U.S. at 495, 66 S.Ct. at 298. In accordance with the negative pregnant of this holding, when faced with issues that would affect the administration of an estate or would usurp the jurisdiction of the state probate court, federal courts have consistently held that said issues are to be resolved by the state probate courts. *See Bassler v. Arrowood*, 500 F.2d 138, 141–42 (8th Cir. 1974), *cert. denied*, 419 U.S. 1116, 95 S.Ct. 796, 42 L.Ed.2d 815 (1975); *Starr v. Rupp*, 421 F.2d 999, 1003 (6th Cir. 1970); *Patterson v. Wynkoop*, 329 F.2d 59, 60 (10th Cir. 1964); *Foster v. Carlin*, 200 F.2d 943, 947 (4th Cir. 1952); *Kittredge v. Stevens*, 126 F.2d 263, 267 (1st Cir.), *cert. denied*, 317 U.S. 642, 63 S.Ct. 64, 87 L.Ed. 517 (1942); *Rousseau, supra* at 456–59; *Dudley v. Board of City Trusts of City of Philadelphia*, 361 F.Supp. 714, 718 (E.D.Pa.1973); *Lightfoot v. Hartman*, 292 F.Supp. 356 (N.D.Mo.1968).

No question is raised concerning the propriety of entertaining the *Manias* and *Merkouris* wrongful death actions in this Court. Indeed, these matters fall within the class of cases concerning estates which are proper for resolution by the federal courts. *See Markham, supra* at 494, 66 S.Ct. 296. However, a finding regarding the validity of Mr. O'Rourke's appointment, by its very nature, would interfere with the Surrogate's jurisdiction. Support for this conclusion is found in the New York Court of Appeals decision in *Stolz v. N. Y. Central Railroad*, 7 N.Y.2d 269, 196 N.Y.S.2d 969, 164 N.E.2d 849 (1959). Since this case has been discussed at some length in section I(D), *supra*, the Court will not engage in a redundant exercise at this point. Worthy of repetition in the context of the Jennings' requests, however, is the *Stolz* Court's admonishment that

> [b]y declaring the plaintiff's appointment invalid and thereupon dismissing these

actions, Trial Term appropriated to itself certain discretionary powers which the Legislature confided only in the Surrogate.

*Id.* 7 at 272–73, 196 N.Y.S.2d at 971, 164 N.E.2d at 850.

▮ Before departing from this area of the law, particular mention must also be made of the *Stolz* Court's approach to the resolution of the question of a representative's capacity to sue. Recollect that the *Stolz* Court opined that the trial court should have suspended the trial until such time as the plaintiff or other interested person made an application to the Surrogate's Court for a ruling on the validity of the questioned appointment. *Id.* at 274, 196 N.Y.S.2d at 973, 164 N.E.2d at 851. Considering that Mr. O'Rourke was appointed in New York, this was the procedure Mr. Jennings was directed to follow.

Thus, in order to avoid interference with the orderly administration of decedents' estates and the infringement of the Surrogate's jurisdiction, and in accordance with the suspension procedure enunciated in *Stolz*, this Court has held in the past and hereby reaffirms its decision that the issue of the validity of Mr. O'Rourke's appointment is within the province of the Queens County Surrogate's Court and is to be presented forthwith to that Court for resolution.

Mr. Jennings and Mr. O'Rourke are to join in settling an order in the *Manias* case (76 C 1022) and an order in the *Merkouris* case (76 C 258) in conformity with this decision, said orders to be settled on notice to Eastern Air Lines under the respective consolidated docket number on or before noon of May 22, 1979.

## VI

THE HANSEN/O'ROURKE PLAINTIFFS' MOTIONS TO "ORGANICALLY" CONSOLIDATE THEIR COMPLAINTS AND REQUESTS FOR A FINDING THAT THEY HAVE CAPACITY TO SUE

The two representatives in the *Peter Schmidt Hansen* and *Wolfgang Hansen*

cases also stand before the Court seeking relief peculiar to their claims. Before examining the ingredients of their motions, it is necessary to retreat, once again, into the factual arena. While the facts pertinent herein have been sketched in section III, *supra*, it is now appropriate to add detail to the picture.

Appointed by the Queens County Surrogate's Court on August 12, 1975 as administrator of the estates of Peter Schmidt Hansen and Wolfgang Hansen, shortly thereafter, Tierney O'Rourke commenced suits against Eastern Air Lines and others on behalf of the Hansen decedents' next of kin. Somewhere in this course of time, Karin Marianne Hansen, the surviving wife of the decedent Wolfgang Hansen, and Mary Hansen, the surviving wife of the decedent Peter Schmidt Hansen, were apparently designated heirs of the estates of Wolfgang Hansen and Peter Schmidt Hansen, respectively by a Denmark tribunal. Thereafter, they, too, commenced separate actions against Eastern Air Lines and other defendants on behalf of their respective decedents and their next of kin.

The *Hansen* and *O'Rourke* cases were not long in this Court together before the Denmark plaintiffs' rumblings of discontent swelled into an open attack upon the validity of Mr. O'Rourke's appointment and his concomitant authority to sue. As with the challenge made by Mr. Jennings, the Denmark plaintiffs were directed to proceed with their title match before the Queens' Surrogate. Subsequent to this directive, the already close quarters of these cases were intensified when the *Hansen* and *O'Rourke* actions commenced on behalf of Wolfgang Hansen were consolidated, and the *Hansen* and *O'Rourke* actions commenced on behalf of Peter Schmidt Hansen were consolidated.

On September 15, 1978, Mr. O'Rourke moved for the entry of liability judgments against Eastern Air Lines pursuant to the Warsaw/Montreal system. The Denmark plaintiffs, still maintaining that Mr. O'Rourke's appointment was invalid, initially opposed his motion. Upon reflection, however, on October 27, 1978 they changed their minds and joined in his application. After due consideration, over Eastern's objection, the Warsaw/Montreal motions were granted. The resulting liability judgments, however, were expressly ordered to provide that no damage trial was to proceed or settlement be effected until such time as the Queens' Surrogate resolved the issue regarding the validity of Mr. O'Rourke's appointment.

Equally dissatisfied with this directive, the attorneys for the respective representatives thereafter agreed that they would proceed as co-counsel in these consolidated cases. Accordingly, they now approach this Court asking essentially that they be appointed as co-administrators of the respective estates. In order to effectuate this status, they move to "organically" consolidate the two consolidated actions and further tighten the confines of their lawsuits by way of a single amended complaint to be served on Eastern Air Lines and the United States. They also ask leave to drop Boeing Company, Rockwell International Corporation and the Port Authority as defendants without prejudice to the continuation of their actions against Eastern and the United States. Additionally, they request this Court to modify its order of December 15, 1978, and the judgment entered pursuant thereto on December 18, 1978, to eliminate the requirement of a Surrogate's Court proceeding, to delete the reservation of Eastern's right to raise their capacity and lack of authorization defenses, and, finally, to hold as a matter of law that the plaintiffs possess capacity to sue and the authorization of the respective decedents' next of kin to prosecute these actions.

Underscoring these motions is a synergetic approach which is certainly a new one for these once battling representatives to adopt. Indeed, this is but another instance in this litigation where "the parties changed positions as nimbly as if dancing the quadrille." *Orloff v. Willoughby*, 345 U.S. 83, 87, 73 S.Ct. 534, 537, 97 L.Ed. 842 (1953). For it now appears that the Denmark plaintiffs and Mr. O'Rourke are declining to

fight another round in the representative bout. Having called it a draw, they are now willing to prosecute these actions together.

Eastern Air Lines, however, opposes any such teamwork. In relying on *Complaint of Cosmopolitan Shipping Co., S. A.,* 453 F.Supp. 265 (S.D.N.Y.1978), to support the proposition that this Court, rather than the Surrogate's Court, must decide which contender is to be awarded the representative title, Eastern impliedly rejects the notion that this Court can recognize both representatives and their hand in glove approach.

In *Cosmopolitan,* the district judge directed the alien next of kin to seek authorization to sue from the Italian courts, noting that after this was done, he would recognize them as the proper representatives of the decedent's estate. 453 F.Supp. at 268. Since the cause of action therein was a federal wrongful death action arising under the Jones Act, the court decided that it, rather than the Surrogate's Court, was the appropriate forum for determining which representative could proceed as plaintiff therein. *Id.* at 266–67. Juxtaposing this view against the Second Circuit's holding in *Benjamins v. British European Airways,* 572 F.2d 913, 919 (2d Cir. 1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (U.S., 1979), that the Warsaw Convention gives rise to a section 1331 cause of action, Eastern urges this Court to choose a plaintiff from each set of Hansen representatives who now are shaking hands.

At first glance, Eastern's approach appears reasonable to the senses. But when attention is directed to its substance rather than its appearance, the superficiality of its foundation is exposed. Nowhere does Eastern cite any authority for the proposition that, in view of the apparent *Hansen* truce, the Denmark plaintiffs and Mr. O'Rourke cannot both be recognized as having the capacity to sue. For that matter, neither the Denmark plaintiffs nor Mr. O'Rourke have cited any authority for the converse proposition. Considering, however, the recently developed neighborly amenities between the respective representatives, any

such authority would undoubtedly be worthy of notation.

The Court's extensive research regarding this unaddressed issue proved unrewarding. In fact, the failure to find a case quite like the instant one only accentuated the unbalanced ratio between effort and result. Nonetheless, while the *Cosmopolitan* decision implies that two representatives cannot coexist within the framework of one cause of action, it must be remembered that the representatives therein were at odds with each other. Furthermore, a different conclusion can be drawn from the Seventh Circuit's decision in *Jones v. Schellenberger,* 196 F.2d 852 (7th Cir.), *cert. denied,* 344 U.S. 876, 73 S.Ct. 171, 97 L.Ed. 679 (1952). There, the Court refused to substitute a later appointed domiciliary administrator in the place of the foreign administrator as plaintiff. However, the Court noted that in the event the domiciliary administrator's interests proved different from those of the foreign administrator, the former could move to intervene. *Id.* at 855.

Such a remark easily lends itself to the interpretation that the Court would recognize both administrators as plaintiffs. An examination of *Jones,* however, also reveals it is distinguishable from the instant matter in that the Court implied recognition only if the representatives' interests were diverse. Since the Denmark plaintiffs and O'Rourke are pursuing identical causes of action on behalf of the same beneficiaries, it cannot be said their interests are diverse. However, if this be deemed a critical limitation, it must be seen in the light of the fact that, like the *Cosmopolitan* case, the *Jones* representatives were also in disagreement.

More closely on the same footing with the cases at bar is the case of *Glenn v. Trans World Airlines, Inc.,* 210 F.Supp. 31 (E.D.N.Y.1962). *Glenn* concerned a wrongful death action which arose from an air crash in Chicago. While the decedent was a New York resident, his mother was a citizen and resident of Hungary. Consequently, the Public Administrator was appointed to administer the decedent's estate. In light of the circumstances surrounding the dece-

dent's death, the Public Administrator commenced suit in New York against the defendant. Thereafter, the decedent's sister was issued Letters of Administration by an Ohio Probate Court. Accordingly, she, too, commenced suit against the defendant, but did so in Ohio rather than New York. The issue presented to Chief Judge Zavatt was whether the Ohio administratrix's motion for a transfer of the Public Administrator's New York action to join its sister Ohio action should be granted. Careful consideration was given to the relevant factors, and the Ohio administratrix's motion was granted.

While the *Glenn* Court was not squarely presented with the question of whether both representatives could proceed as plaintiffs, by transferring the New York action to Ohio, the Court assumed an affirmative answer to this question. Significantly, the Court remarked that the Public Administrator could sue in Ohio without seeking Ancillary Letters. *Id.* at 34 n.1. It was further indicated that the impending transfer would militate against any problems which may have arisen by virtue of the two appointments since both representatives would be before one tribunal. *Id.* at 34.

An additional case worthy of mention is *Anderson v. Louisville § N. R. Co.*, 210 F. 689 (6th Cir. 1914). While *Anderson* may be an old case, its reasoning is not senile. In *Anderson*, an administratrix had been appointed in Kentucky, and an administrator had been appointed in Tennessee. With the consent and best wishes of the Kentucky administratrix, the Tennessee administrator instituted suit in Tennessee. Like Eastern Air Lines, the defendant therein frowned upon this amicable arrangement and claimed that the Kentucky administratrix was the proper plaintiff. The Court, however, disagreed and permitted the Tennessee administrator to continue the action. After reaching this conclusion, the Court significantly observed that the Kentucky administratrix could have been joined with the Tennessee administrator as plaintiff. *Id.* at 695. Such a remark certainly indicates that the Sixth Circuit would have recognized both representatives as plain-

tiffs. Considering that, like the *Hansen* representatives, the Anderson representatives were aligned auspiciously, the Court's implicit sanction of two representative plaintiffs suing on the same cause of action is certainly relevant herein.

■ Notwithstanding the strong implications favoring an affirmative response to the question of whether two representatives can be acknowledged as plaintiffs in the same cause of action, a direct answer remains unsaid. Furthermore, Eastern's reliance on *Benjamins* as mandating that a *Cosmopolitan* choice must be made between the respective pair of representatives does not aid in rendering an answer to this question. Initially, it must be remembered that the federal statutory cause of action sued on in *Cosmopolitan* provided a specific framework for the suit. *See Cosmopolitan, supra* at 266. Indeed, most federal wrongful death actions explicitly state that the suit must be commenced by a personal representative, and they enumerate the persons who are to be benefited thereby. *See, e. g.*, 46 U.S.C. §§ 688, 761 (1976); 45 U.S.C. § 51 (1976). However, *Benjamins* does not define the cause of action it promises. Similarly, no explicit directives are found in 28 U.S.C. § 1331 (1976) or in the Warsaw Convention. In fact, Article 24(2) of the Convention merely provides that an action may be commenced

> without prejudice to the questions as to who are the *persons* who have the right to bring suit and what are their respective rights.

(Emphasis added). Thus, the search for an answer in the face of such silence is reminiscent of chasing a mirage. Of some note, however, is that the Death on the High Seas Act, 42 U.S.C. § 761 (1976), the Jones Act, 46 U.S.C. § 688 (1976) and the Federal Employers' Liability Act, 45 U.S.C. § 51 (1976) speak in terms of a single "personal representative" as the proper party to commence suit. Perhaps use of the plural "persons" provides inertial guidance that the Warsaw signators impliedly acknowledged thereby that more than one person can be recognized as plaintiff.

Given the nonspecific framework for a *Benjamins* cause of action, it may well be appropriate to look to state law as guidance to the recognition question and to fill in the notably absent gaps such as who is to bring the Warsaw cause of action. Indeed, since the *Hansen* cases fall squarely within section 1332 jurisdiction, this approach may be mandated by the *Benjamins* Court's statement that

> [m]ost cases will fall under 28 U.S.C. § 1332, as they do today; only when plaintiffs and defendants are all aliens, but the United States is a nation with treaty jurisdiction, will it be necessary to invoke 28 U.S.C. § 1331.

*Benjamins, supra* at 919. Reference to New York law may also be warranted since the *Hansen* cases were commenced pre-*Benjamins*, and, accordingly, the causes of action therein apparently are premised on New York's wrongful death statute.

Thus, looking to New York's wrongful death statute, whether on the basis that these actions are pre-*Benjamins* diversity actions, *Benjamins* diversity actions, or *Benjamins* federal causes of action, it is found that said action must be commenced by the personal representative of the decedent. N.Y. Est., Pow. & Trusts Law § 5–4.1 (McKinney 1967). Significantly, the term "personal representative" opens the door of New York courts to a foreign representative as it has been construed to allow a foreign representative to prosecute a wrongful death action on the strength of his own authority. *See Wiener v. Specific Pharmaceuticals,* 298 N.Y. 346, 352, 83 N.E.2d 673, 676 (1949). Accordingly, the *Hansen* representatives are not removed from the picture as not having capacity to sue or as being the wrong party to commence suit. However, this does not negate Mr. O'Rourke's role as administrator, nor does it undermine his authority to sue under the strength of his Letters.[16] *See* N.Y. Surr.Ct.Proc.Act § 703 (McKinney 1967). See also section IV, *supra.* Thus, it appears that both a foreign representative and a New York representative may have capacity to sue. Accordingly, at least in instances where they are proceeding harmoniously before the same court, rather than each contesting the other's authority, it follows that both could be recognized as plaintiffs in an action. To echo the *Anderson* Court, in such cases

> no question of conflict in jurisdiction, or of difference between the plaintiff and

---

16. Of note is that section 704 of the Surrogate's Court Procedure Act establishes a priority among different Letters and states that a person who is first issued said Letters from a Court having jurisdiction to do so has exclusive authority under said Letters until revoked. While this section is indeed applicable in New York courts when a conflict between administrators arises, under the strain of reasoning followed in *Cosmopolitan, supra,* it may not be applicable to a federal cause of action or a suit in federal court. Recollect that in *Cosmopolitan* the Public Administrator had been granted Letters and, notwithstanding, the Court did not recognize them but instead directed the foreign next of kin to procure certificates of authority from the Italian Courts. 453 F.Supp. at 267–69. *But see In re Taomina's Estate,* 2 App. Div.2d 711, 153 N.Y.S.2d 250 (2d Dep't 1956), *aff'd,* 2 N.Y.2d 878, 161 N.Y.S.2d 135, 141 N.E.2d 622 (1957).

Moreover, this section appears to address the situation of two administrators battling for the title to administer an estate, rather than a situation where they are attempting to proceed together. It further appears to be directed to reconciling the problem of administering tangible property in New York, rather than reconciling the problem of two administrators proceeding to prosecute a wrongful death action when said action is the only property in New York. Considering that the section speaks in terms of Letters, it may also be that it was not intended to apply to foreign certificates of authority. In such a case, considerations of international comity may be appropriate.

Finally, but of much significance, this Court perceives a difference between the capacity issue, which under Rule 17(b) is governed by the law of the forum, and the issue of which representative's Letters have priority and, therefore, which one should proceed as plaintiff in an action. As has been established in the body of this opinion, under New York law, both Mr. O'Rourke and the Hansen representatives possess the capacity to sue. Since section 704 does not add to or detract from the substantive aspect of capacity, it may be that a federal court need not take note of section 704, but, instead is to be guided by federal considerations.

the other administrator or the beneficiaries, arises.

*Anderson, supra* at 693.

Of note at this point is the Second Circuit's remarks in *Briggs v. Pennsylvania R. Co.*, 153 F.2d 841, 843 (2d Cir. 1946). Permitting the issue of whether two representatives with diverse origins can stand together before a court to merely lurk in the background, the Court, nonetheless, detected the inherent inconsistency in such a circumstance. In doing so, the Court significantly stated:

> [C]onflicts may arise when both a domiciliary and an ancillary administrator have been appointed; but they will not be beyond just settlement, if they do; and whatever they may be, they are not before us in the case at bar.

*Briggs, supra* at 843. In light of the foregoing considerations coupled with the supple adaption evidenced by the representatives herein, perhaps the recognition of both sets of representatives in each case and a direction that they proceed as a unit in prosecuting or settling these actions is the "just settlement" spoken of in *Briggs* which should be reached herein.[17]

In considering this finding, the Court fails to see how Eastern can be prejudiced thereby. If both parties proceed together, it cannot be said that the beneficiaries will not be bound by the ultimate result of the joint effort. This is especially true since the status of beneficiary and representative overlap with respect to both of the Denmark plaintiffs. Furthermore, since both actions have been consolidated in New York, Eastern can have no fear of multiple damage suits. However, notwithstanding such factors indicating the acceptance of both sets of representatives as plaintiffs, such a just settlement is not ripe for rendition at this time for numerous reasons.

First, while paragraph two of Karin Marianne Hansen's amended complaint states that on November 6, 1975, the Surrogate Court of Frederikssund, Denmark decreed that Wolfgang Hansen's estate be handed over to her, a copy of a certificate evidencing this has not been submitted to this Court. Similarly, paragraph two of Mary Hansen's amended complaint states that on July 25, 1975, the Surrogate's Court of Esbjerg, Denmark decreed that Peter Schmidt Hansen's estate be handed over to her, yet no copy of any decree to this effect has been submitted to this Court. Indeed, it is difficult to decide whether these plaintiffs have capacity in the absence of a translated copy of the decree and citation to and an explanation of the relevant law. Indeed, this Court does not know if said decrees entitle them to act as representatives or if they only designate them as beneficiaries authorized to partake in any recovery that might be awarded in these suits. Wearied by the staggering expanse of law already covered by this litigation, this Court will leave the discovery of such new vistas, in the first instance, to the plaintiffs. *See Iafrate v. Compagnie Generale Transatlantique*, 106 F.Supp. 619, 622 (S.D.N.Y.1952).

■ A second problem appears upon a perusal of the Denmark plaintiffs' complaints. In paragraph 17 of each complaint, they seemingly are seeking to recover for the pain and suffering sustained by their respective decedents. This claim appears to be in addition to their separate wrongful death claim for damages sought on behalf of their decedents' next of kin. Notwithstanding these apparently individual causes of action, only one monetary recovery is sought by each plaintiff. A problem, therefore, arises by such terminological niceties. While a foreign representative need not procure Ancillary Letters of Administration to prosecute a wrongful death action, *see* N.Y. Est. Pow. & Trusts Law § 5–4.1 (McKinney 1967); *Wiener v. Specific Pharmaceuticals, supra*, 298 N.Y. at 352, 83

---

17. If it is found that both representatives can be recognized as plaintiffs in this action, and in the event of a damage trial, the Court would ask the plaintiffs to designate one attorney as trial attorney. Such a nomination is warranted by the fact that these nominal plaintiffs' interests are exactly the same in that both are advancing the interests of the same beneficiaries.

N.E.2d at 676, it appears that in an action for a decedent's pain and suffering, such Letters must be acquired, *id.* at 351, 83 N.E.2d at 675. This is so because any recovery for pain and suffering, unlike a wrongful death recovery, inures to the benefit of the decedent's estate rather than to specific beneficiaries. *See, e. g., C. V. Sea Witch,* 196 A.M.C. 2498 (S.D.N.Y.); *In re Kauffmann's Estate,* 167 Misc. 83, 3 N.Y. S.2d 486 (Surr.Ct.N.Y.Cty.1938). However, under the reasoning of *Wiener, supra* 298 N.Y. at 351, 83 N.E.2d at 675, Ancillary Letters may be unnecessary if the decedents herein left no domestic creditors. In such an instance, there would be no need for a fund in which creditors could share since there would be no creditors. *See id. But see In re Taomina's Estate, supra* note 16.

■ If such Letters are necessary, however, a party seeking them must first establish the existence of a foreign administration or similar probate proceeding. N.Y. Surr.Ct.Proc.Act § 1601 (McKinney 1967). Thereafter, the Surrogate may issue Ancillary Letters of Administration in accordance with a statutory priority provided, however, that the petitioner is eligible to receive Letters. *Id.* at § 1607. Since nondomiciliary aliens are ineligible to receive Letters, *id.,* § 707, it appears that the authorized nondomiciliary alien would have to designate an eligible designee as one to receive Ancillary Letters. *See, id.* at § 1608; *Estate of Theodoropoulos,* 93 Misc.2d 551, 402 N.Y.S.2d 927 (Surr.Ct.N.Y. Cty.1978); *In re Taomina's Estate, supra.*

■ To further confuse matters, if it is said that the plaintiffs' complaints are predicated on a *Benjamins* cause of action, it could be said that no Ancillary Letters would be necessary since Article 17 of the Convention includes an action for injuries as well as death. Accordingly, a foreign representative should be able to pursue both claims in federal court without obtaining Ancillary Letters from the state. *Cf.* Complaint of *Cosmopolitan, supra* at 267; *Iafrate, supra* at 622. In any event, since it does not appear that a separate monetary recovery is sought in these cases for pain and suffering, the foregoing may be but an idle academic exercise. Nonetheless, the nature of the actions sued on herein should be clarified prior to a ruling regarding the representatives' status.

■ A third potential problem demanding recognition concerns the status of the prior representative title match. When instilled with the vigor of contesting the validity of Mr. O'Rourke's appointment, both Mary Hansen and Karin Marianne Hansen tendered the question of the validity of Mr. O'Rourke's appointment to the Queens' Surrogate for determination. Thereafter, their motions for summary judgment to set aside and vacate Mr. O'Rourke's Letters were denied by the Queens' Surrogate on the ground that triable issues of fact existed regarding the Surrogate's jurisdiction. Said orders were affirmed on appeal to the Appellate Division, Second Department on March 13, 1978. This does not necessarily mark the end of the road, however. The issue may be on appeal to the New York Court of Appeals or may still be pending for trial before the Surrogate. Accordingly, since federal courts have been specifically warned "not [to] interfere with the probate proceedings or assume general jurisdiction of the probate," *Markham v. Allen,* 326 U.S. 490, 494, 66 S.Ct. 296, 298, 90 L.Ed. 256 (1946), and in deference to the general principle that "state and federal courts [are] not [to] interfere with each other's proceedings," *Donovan v. City of Dallas,* 377 U.S. 408, 412, 84 S.Ct. 1579, 1582, 12 L.Ed.2d 409 (1964), this Court will not rule on the capacity issue at this time, but, instead, it will await the Surrogate's ruling on this matter, if said issue is pending before it.

Finally, the last problem that lingers in this case concerns a redefinition of the relationship between Mr. O'Rourke and the Denmark plaintiffs. While both are apparently proceeding hand in hand, nowhere is it stated by the Hansen plaintiffs that they no longer wish to contest the validity of Mr. O'Rourke's appointment. Until a stipulation to this effect is received, the prosecution of these cases cannot be assured of the

cooperation that permeated the *Anderson* case. In stating this, the Court is not attaching more importance

> to the right of the representative in whose name the action must be prosecuted, and less to the rights of those for whose benefit an action is preserved . . . .

*Anderson, supra* 210 F. at 691. To the contrary, by suggesting the submission of said stipulation, the Court is keeping a watchful eye on the beneficiaries' interests while guarding against possible prejudice to Eastern by virtue of its negotiating with or defending against two representatives. If an agreement evidencing the Hansen truce is not submitted, differences between the respective sets of representatives or the beneficiaries or both may arise, and said differences may breed impediments to the trial or settlement of these actions. Furthermore, a trial or settlement to the dislike of one representative may mark the birth of collateral estoppel questions of whether the beneficiaries authorized that representative to represent their interests and, accordingly, are to be bound by his efforts. *But see Scott v. N. Y. C. & St. L. R. Co.*, 159 F.2d 618, 619 (7th Cir. 1947); *Glenn, supra* at 34.

In light of these considerations and in order to clarify a record replete with accusations that Mr. O'Rourke was improperly and invalidly appointed, to clarify whether or not this issue remains before the Surrogate, and to put an end to this bout, if desired, each pair of representatives on these cases may submit to this Court and the Queens Surrogate's Court a stipulation evidencing the end to the dispute heretofore present. Said stipulations are to provide that any claims of improper or invalid appointment are hereby withdrawn and that both parties intend to proceed harmoniously in these actions.

In the event that this is done and the plaintiffs wish this Court's ruling on the capacity question, they are to submit memoranda of law on all of the problems raised herein with particular emphasis on the propriety of the recognition of both representatives as plaintiffs herein. Should Eastern

Air Lines wish to oppose the recognition of two plaintiff-representatives in each Hansen case, it must submit an opposing memorandum of law stating why this cannot be done, and it must point to any prejudice that will accrue to it by such a recognition.

Needless to say, the foregoing does not foreclose the Denmark plaintiffs from petitioning the Surrogate's Court for the revocation of Mr. O'Rourke's Letters, *see In re Taomina's Estate, supra*, or from following whatever viable course they deem to be in their best interest.

 Notwithstanding the problems highlighted above, an "organic" merger of the two complaints in each consolidated action into one amended complaint so that the representatives appear as co-plaintiffs will neither interfere with the Surrogate's jurisdiction nor prejudice Eastern Air Lines in any way. Accordingly, the plaintiffs' motions to this effect are granted. Furthermore, the plaintiffs may serve said amended complaint upon Eastern Air Lines and the United States, said complaint to delete Boeing, Rockwell International Corporation and the Port Authority as defendants without prejudice to the continuation of plaintiffs' actions against Eastern and the United States. However, those portions of the plaintiffs' motions requesting that they be designated as co-administrators are denied as this Court is without authority to perform such an act. See section V, *supra*.

Finally, since this Court declines the plaintiffs' invitation to rule presently on the capacity issue for the reasons set forth above, those portions of the plaintiffs' motions concerning capacity and authorization to sue are denied with leave to renew as heretofore conditioned. Notwithstanding said denial, the Order of December 15, 1978 and the judgments entered in accordance therewith on December 18, 1978, are hereby modified as follows: If the capacity issue has been and remains pending before the Surrogate of Queens County, the parties therein are to continue with said proceeding. If however, said issue presently lies fallow, the parties can submit the aforementioned stipulation withdrawing their

objections which can include a statement to the effect that since no issue remains to be presented to the Surrogate, a Surrogate's proceeding no longer is necessary. Furthermore, considering the amicable positions adopted by the plaintiffs herein, and being of the opinion that no prejudice will accrue to Eastern Air Lines, the Court's Order is further modified to the extent that even if no stipulations are submitted, should all the parties herein agree to a settlement, said settlement may be effectuated.

To summarize, the motions made by Tierney O'Rourke and Karin Marianne Hansen in the *Wolfgang Hansen* cases (76 C 256) and by Tierney O'Rourke and Mary Hansen in the *Peter Schmidt Hansen* cases (76 C 255), are granted in part and denied in part with leave to renew as set forth above. Each pair of plaintiffs is to join in settling an order in conformity with this decision under the respective consolidated docket number, said orders to be settled on notice to all the defendants involved herein on or before May 22, 1979.

### VII

### THE CAPPIELLO/O'ROURKE MOTIONS TO DISMISS THE CAPPIELLO ACTIONS AND FOR A FINDING THAT THE PLAINTIFFS HAVE CAPACITY TO SUE

The last in the series of the plaintiffs' requests encased in this spiraling motion motif concern the *Priniotakis, Alexandridis* and *Hadzis* disputed representative cases. As was true with their companion cases, the factual background of these matters must be unfolded before a disposition is discussed.

Having been issued Letters of Administration in the estates of Priniotakis, Alexandridis and Hadzis, Tierney O'Rourke instituted suit against Eastern Air Lines and other defendants on behalf of the respective decedents' next of kin. The ease with which these actions could be prosecuted, however, was short-lived. On December 31, 1975, George Cappiello was issued Letters of Administration in the estates of Prinio-

takis and Alexandridis by the Register of Philadelphia. Some nine months later, on September 22, 1976, he was issued Letters of Administration by the Register in the estate of Hadzis. On the strength of such authority, he, too, commenced actions against Eastern Air Lines and other defendants on behalf of the respective decedents' next of kin. The Cappiello suits were instituted in the Eastern District of Pennsylvania but were subsequently ordered transferred to this Court by decree of the Judicial Panel on Multidistrict Litigation.

This relocation spurred a confrontation with the O'Rourke actions. Deeming Mr. O'Rourke's appointment as similar to a chronicler of pestilence, Mr. Cappiello wasted no time in challenging Mr. O'Rourke to a match for the title of representative of these estates. However, as was told to Mr. Jennings, Mr. Cappiello was informed that the ring for this bout could not be set up in this Court, and he was directed to set it up in the Queens Surrogate's Court. Whether Mr. Cappiello heeded to this directive and proffered the question of the validity of the O'Rourke appointment to the Surrogate remains a mystery.

The O'Rourke-Cappiello dispute was a viable one at the time the Cappiello actions were consolidated with their sister actions commenced by Mr. O'Rourke. Despite the fact that Mr. Cappiello joined in Mr. O'Rourke's autumn motions in these cases for entry of Warsaw/Montreal liability judgments against Eastern Air Lines, the representative battle continued to be waged.

Recognizing that said dispute placed Eastern in a precarious position, the resulting Warsaw/Montreal liability judgments were fashioned to guard against possible injury. Apparently disgruntled with the judgments' clause prohibiting a trial or settlement of these actions until the representative title was decided by the Queens' Surrogate, Mr. Cappiello has now refused to fight another round. Evidence of this technical knockout is found in Mr. Cappiello's attorney's affidavit wherein the belief is expressed

that the appointment of the Public Administrator in this case was valid and that he may maintain this action.

Also evidencing this new position are the instant motions wherein Mr. Cappiello and Mr. O'Rourke ask this Court to dismiss without prejudice the *Priniotakis, Alexandridis* and *Hadzis* actions instituted by Mr. Cappiello. Should this Court grant said motions, a modification of this Court's December 19, 1978 Order is requested. Specifically, they ask that the requirement of a Surrogate's Court proceeding be deleted, that Eastern's lack of capacity and authorization defenses be stricken and that "plaintiffs" be found to possess capacity to sue as well as the authorization by decedents' next of kin to prosecute these actions.[18]

Allegations that the three decedents' next of kin have sanctioned Mr. O'Rourke's attorney to act on their behalf and to prosecute these actions are proffered in support of these motions. Additional support is offered by allegations that the next of kin have consented to the dismissal of the Cappiello actions. In order to insure protection of the interests of the next of kin, however, Mr. Cappiello asks that the requested dismissal be without prejudice in the event his belief regarding the validity of Mr. O'Rourke's appointment is ill-founded.

At the outset, heed must be taken of the fact that the legal problems attendant to the *Hansen* cases, see section VI, *supra*, are not applicable to the instant matters. In the *Hansen* actions, this Court questions the propriety of recognizing two personal representatives as nominal plaintiffs suing for the same beneficiaries. In doing so, it impliedly acknowledges that the normal course followed is the prosecution of such a suit by one representative. In the cases at bar, the parties are not seeking the Court's recognition of both representatives as plaintiffs. To the contrary, Mr. Cappiello is requesting that his actions be dismissed, that Mr. O'Rourke be entitled to stand alone as the sole administrator-plaintiff, and, consequently, that Mr. O'Rourke be found to have capacity to sue and the authorization of the decedents' next of kin to prosecute these actions. *See* note 16, *supra*.

The Court's search for fresh valuations on the propriety of granting the instant motions proved unyielding in result. Nonetheless, ignoring the early case of *Anderson v. Louisville & N. R. Co.*, 210 F. 689 (6th Cir. 1914), which concerns issues analogous to those presented herein, would be similar to trying to sleep with the light in one's eyes. As has already been noted, see section VI, *supra*, the *Anderson* case involved a Kentucky administratrix who requested that a Tennessee administrator be allowed to prosecute a wrongful death action. In approving of this arrangement, the *Anderson* Court significantly noted:

> [S]ince, as stated, the death occurred in Tennessee and the suit was brought and prosecuted there with the approval of the Kentucky administratrix and principal beneficiary, no question of conflict in jurisdiction, or of difference between the plaintiff and the other administrator or the beneficiaries, arises. Thus the right to maintain the suit in the name of the present plaintiff is met by objection only of the alleged negligent railroad; and while it is true that the defendant is entitled to have the suit instituted so that any final judgment rendered will protect it against every one else, including the beneficiaries, it cannot be doubted that the court having control of the plaintiff can compel distribution of any amount received according to the terms of the statute.

---

18. At first glance, this Court was troubled by the use of the plural "plaintiffs" in reference to the request that this Court find that capacity to sue exists. For if Mr. Cappiello was found to have capacity to sue and thus to be a proper party, it would appear inconsistent to thereafter dismiss him from these actions. *See Anderson, supra* at 695; section VI, *supra*. *But see* 20 Pa.Cons.Stat. §§ 3358, 901 and 3156(4) (Purdon 1975). Nonetheless, since Mr. Cappiello is asking to be dismissed from these actions, it would appear that this issue need not be reached; the only party whose capacity would be in issue is that of plaintiff O'Rourke. Accordingly, this Court has construed the instant request to be one for a finding that Mr. O'Rourke has capacity to sue.

*Id.* at 693 (citations omitted). This revived finding holds equally true to the matters at hand.

Noteworthy to the instant matters is that Mr. Cappiello, Mr. O'Rourke and the respective beneficiaries are apparently agreeing to the manner in which these actions are to be prosecuted. Consequently, the beneficiaries would be bound by the result of Mr. O'Rourke's efforts. This being so, the fear of multiple suits and concomitant collateral estoppel problems would remain housed in an illusion. Additionally, the dismissal of the Cappiello actions and recognition of Mr. O'Rourke as sole plaintiff in the remaining cases would neither interfere with the Register's jurisdiction nor would it constitute a collateral attack upon the validity of the decrees he issued. *See* 20 Pa.Cons.Stat. §§ 901 and 3358 (Purdon 1975).[19]

▮▮▮ In light of these considerations, this Court agrees with the *Anderson* Court's observation that

> any validly appointed personal representative of a deceased [should be permitted] to maintain the suit; and especially must this be so where it is plain, as here, that no injustice can thereby result either to the beneficiaries or the defendant.

210 F. at 694. Applying this conclusion to the matters at hand, since Mr. O'Rourke's Letters of Administration are "conclusive evidence" of his authority to proceed thereunder, N.Y.Surr.Ct.Proc.Act § 703 (McKinney 1967), he falls within the category of a "validly appointed personal representative," *Anderson, supra* at 694. Accordingly, he is entitled to maintain these suits.

▮▮▮ The logic of the foregoing words, however, must defer to the logic dictated by reality, and such reality presents a possible obstacle to the grant of the instant requests at this time. To elaborate, as was stated earlier, this Court is in the dark regarding whether or not Mr. Cappiello implemented the December directive to tender the question of the validity of Mr. O'Rourke's appointment to the Queens' Surrogate. If Mr. Cappiello has presented this issue to the Surrogate for resolution, in deference to the Surrogate, this Court should stay its hand from ruling on the instant motions. *See, e. g., Donovan v. City of Dallas,* 377 U.S. 408, 412, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964); *Markham v. Allen,* 326 U.S. 490, 494, 66 S.Ct. 296, 90 L.Ed. 256 (1946).

If, however, in light of the amicable turn of events, said issue was not so presented or was withdrawn from the Surrogate's consideration, then this Court could proceed to rule on these motions. Considering the foregoing discussion, the Court would grant the motions at hand. However, until such time as this obstacle is removed from the Court's path, Mr. Cappiello and Mr. O'Rourke's motions must be denied. Leave to renew said motions upon an adjudication of the validity of Mr. O'Rourke's appointment, however, is granted. If no such determination is to be forthcoming, the parties may renew their motions upon submission of a stipulation from the representatives herein to the effect that said issue is not pending before the Surrogate and upon submission of an affidavit from the respective next of kin in each case to the effect that they consent to the dismissal of the Cappiello actions and request that Mr.

---

**19.** With respect to the absence of any conflict in jurisdiction, of note is the absence of a philosophical conflict between New York and Pennsylvania law. As has been noted in section I(D), *supra*, New York subscribes to the interest analysis approach to choice of law problems. Similarly, in *Griffith v. United Air Lines,* 416 Pa. 1, 203 A.2d 796 (1964), the Supreme Court of Pennsylvania abandoned the lex loci delicti rule in favor of the interests analysis approach, and in doing so, the Court relied on *Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963). Thus, while Pennsylvania recognizes a cause of action for wrongful death, 12 Pa.Cons.Stat. § 1601 (Purdon 1975), like New York, it would consider the interests of its state and the other interested jurisdiction in determining whether to apply its statute. Considering that both the death certificate and the certificate of the Mayor of the District of Pireas states that the decedent Priniotakis was a Greek citizen, and that the death certificates of the decedents Alexandridis and Hadzis state that they, too, were Greek citizens, it appears that both New York and Pennsylvania would apply Greek law on the issue of damage distribution.

O'Rourke represent their interests by prosecuting his actions.[20]

In the event that said stipulations and affidavits are submitted, rather than renoticing this motion for argument, the representatives may submit in conjunction therewith a proposed order to be settled on notice of one week to Eastern Air Lines. In essence, said order may provide that the *Priniotakis* (76 C 575), *Alexandridis* (76 C 574) and *Hadzis* (77 C 1) actions commenced by Mr. Cappiello are dismissed without prejudice to the continuation of the *Priniotakis* (76 C 260), *Alexandridis* (76 C 265) and *Hadzis* (76 C 1095) actions commenced by Mr. O'Rourke on the ground that Mr. Cappiello and the next of kin have requested said dismissals and have consented to the prosecution of these matters by Mr. O'Rourke. Since Mr. O'Rourke holds Letters of Administration, since no contest exists regarding the validity of his appointment and since he is the only plaintiff in the remaining sister cases, said order may further provide that Mr. O'Rourke has capacity to sue. Finally, in light of the affidavits which will have been submitted by the next of kin to trigger the renoticing of these motions, said order may also provide that Mr. O'Rourke possesses authorization to sue by the decedents' next of kin.[21]

Mention must be made at this point that Eastern Air Lines has already been given adequate opportunity to oppose the subject motions, and, indeed, it has proceeded to do so. The arguments it advances in opposition have been carefully considered by the Court in reaching the foregoing resolution. When coupled with the fact that the ultimate determination of these motions turns on the existence or nonexistence of a fact which is without Eastern's control, these considerations not only warrant the use of the foregoing order procedure but also deem it fair and just.

In the event that the question of the validity of Mr. O'Rourke's appointment is pending before the Surrogate's Court, as was stated, the instant motions are denied with leave to renew. Notwithstanding the existence of this proceeding, however, should all the parties to these consolidated actions agree upon a settlement of one or more of these cases, said settlement may be effectuated, and the Court's earlier order to the contrary is to be modified accordingly.

For the time being, however, Mr. Cappiello and Mr. O'Rourke's motions in the consolidated cases of *Priniotakis* (76 C 260), *Alexandridis* (76 C 265), and *Hadzis* (76 C 1095) to dismiss the *Priniotakis* (76 C 575), *Alexandridis* (76 C 574) and *Hadzis* (77 C 1) actions commenced by Mr. Cappiello and for the additional relief requested are presently denied with leave to renew. The representatives herein are to submit orders in conformity with this decision on notice to Eastern Air Lines, said orders to be submitted under the respective docket number on or before noon of May 22, 1979.

## VIII

## EASTERN AIR LINES' MOTIONS FOR SECTION 1292(b) CERTIFICATIONS OF ALL THE WARSAW/MONTREAL JUDGMENTS

Finding the journey's end in every step of the road, this Court turns to Eastern Air Lines' motions pursuant to 28 U.S.C. § 1292(b) (1976) for certification of the Warsaw/Montreal liability judgments entered against it in the disputed and non-disputed representative cases. In doing so, this Court nears the apex of this Sisyphean legal odyssey.

Eastern supports its motions by proffering a variety of arguments. Initially, Eastern claims that substantive law does not

---

**20.** Since the next of kin in these cases are aliens, it is assumed that said affidavits will be drawn in their native tongues. Mr. O'Rourke, however, is to provide certified translations thereof, said translations to be submitted with the originals.

**21.** While this Court is of the opinion that no collateral estoppel problems may arise in that both Mr. Cappiello and the respective decedents' next of kin will be bound by any determinations in the O'Rourke proceedings, the receipt of these affidavits executed by the next of kin will seal this fate.

countenance the grant of the disputed motions and consequential entry of Warsaw/Montreal judgments in any of the cases at bar. As to the non-disputed representative cases, Eastern claims that the swiftness with which these motions were made and granted was tantamount to a denial of procedural due process.[22] Such a grave legal misstep, Eastern concludes, mandates the grant of section 1292(b) certification of this class of cases.

Certification of all of the cases herein is also urged on the basis of the multidistrict personality common to them. Eastern initially notes that section 1292(b) certification of the liability issue in MDL 227 was granted. Since the instant Warsaw/Montreal cases total half the number of cases that were involved in the MDL 227 trial, Eastern deduces that they are multidistrict in nature. Hence, Eastern argues, they warrant certification for appeal due to said characterization.

Also noted is that several plaintiffs have requested a remand of their actions to their home districts, but that said transfers have been temporarily stayed by the Second Circuit. Relying on this Court's decision of December 1, 1978, Eastern argues that the possibility of implementing said transfers scatters the seeds of inconsistent appellate rulings. If these seeds take root, the multifaceted problems of collateral estoppel will blossom. Considering the weight given to such potential problems in the December 1, 1978 certification of the MDL 227 liability issue, Eastern contends that their looming presence in the cases at hand renders it proper to certify all of the Warsaw/Montreal judgments for appeal.

Finally, but certainly of compelling importance, Eastern reminds this Court of the Second Circuit's remarks from the bench on January 16, 1979 regarding certification of the non-disputed representative cases for appeal:

we are suggesting that in view of the fact that this is a multi-district litigation

and it is desirable to have a single circuit pass on controlling questions of law, Judge Bramwell in his good discretion ought to consider very seriously the filing of a 1292(b) order to enable this court to consider the appeals in both lines of cases.

Adding this to their own litany of reasons, Eastern concludes certification of all of the Warsaw/Montreal judgments is appropriate.

While this Court concurs in Eastern's final conclusion, it does not find that all of the steps Eastern has climbed to arrive at it are sound. Of initial note is this Court's agreement with Eastern that the cases at bar are multidistrict in nature. However, such a characterization is warranted by the varied origin of these cases, not by the nicety of a mathematical calculation. Furthermore, it must be reiterated that Eastern Air Lines has never claimed that the Warsaw/Montreal system is inapplicable to these cases. Expressly to the contrary, it specifically sets forth this system as a defense in its answer to each and every claim involved herein. Thus, in granting the plaintiffs' motions for the judgments at issue, this defense was transposed from a lifeless defense encased in paper to a viable, impregnable one. Indeed, this observation unearths a paradox of sorts since it strips naked the reality of the agreement between the plaintiffs and Eastern on this issue.

■ Notwithstanding this irony, Eastern requests this Court for certification and, in doing so, for a finding that there is a question of law as to which there is substantial ground for difference of opinion. However, the nature of the Warsaw/Montreal scheme poses difficulties with such a finding on the issue of Eastern's fault. As has been strenuously noted in section I(C), *supra*, the Warsaw Convention is a treaty and, as such, is the supreme law of the land. While the Montreal Agreement is not clothed in such a sovereign robe, it is an agreement to which Eastern is a party and, accordingly, Eastern is bound thereby.

---

**22.** Since Eastern Air Lines was undeniably given more than adequate opportunity to respond to the disputed representative's motions for entry of Warsaw/Montreal liability judgments, it does not claim a denial of procedural due process in said cases.

Since there is no dispute that the Warsaw/Montreal system controls these cases, a court has no choice but to apply the principles contained therein pertaining to fault. *See, e. g., Benjamins v. British European Airways,* 572 F.2d 913, 917 (2d Cir. 1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (U.S.1979); *Reed v. Wiser,* 555 F.2d 1079, 1092 (2d Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977). *See also,* cases cited in section I(D), *supra.* Considering that the law is so firmly settled in this respect, it cannot be said that the question of Eastern's fault presents a controlling question of law as to which there is a substantial ground for a difference of opinion.

Also worthy of mention is that the personality of the Warsaw/Montreal system defies the possibility of inconsistent appellate rulings on the issue of fault. Unlike the law attendant to negligence, which varies from state to state, the Warsaw/Montreal system is inflexible. Thus, a Louisiana court's interpretation of New York negligence law is laden with the possibility that it will conflict with a New York court's interpretation of this law, since aspects of this law are open to judicial construction. Given the unyielding stability of the unambiguous Warsaw/Montreal provisions regarding fault and limitation of damages, however, differences in individual judicial interpretations regarding these provisions are foreclosed from arising. Additionally, this clear picture of fault and damage limitations similarly negates the possibility that collateral estoppel problems will arise.

Therefore, rather than resembling the litigious situation presented before the certification of the jury's liability verdict in MDL 227, the instant situation is more closely aligned with the situation that will ensue afterwards if the liability verdict is affirmed. In both brands of cases, the parties are left with judgments only on the issue of fault. Thus, any subsequent appeals would flow from individual trials on damages, and any inconsistent appellate rulings would have no bearing on the issue of fault. Rather, they would result from the inherent uniqueness of each plaintiff's

damages. This being so, any conflicts in appellate rulings would not fray the supporting thread of commonality that interweaves multidistrict cases together.

■ Since it has been extensively discussed in sections I, II and III, *supra,* suffice it to say that this Court adheres to its decisions to grant the Warsaw/Montreal motions in all of the cases at hand. Considering the foregoing, this Court is disinclined to certify for appeal the issue of Eastern's fault embodied in the resulting judgments. The Court, however, will certify for appeal the issue of the propriety of granting the Warsaw/Montreal motions in the face of Eastern's interposition of the defenses of lack of capacity to sue and the application of foreign law in all of the cases at bar and the defense of lack of authorization of the decedents' next of kin in all but the *Behar, Hickey* and *Bright* cases. Indeed, the propriety of granting said motions notwithstanding Eastern's three defenses, and the manner in which said motions were instituted and granted in the non-disputed representative cases, present questions the answers to which are subject to individual judicial interpretation. Consequently, as discussed in this Court's opinion of December 1, 1978, such individual interpretation could breed the problem of inconsistent appellate rulings, which, in turn, could spawn collateral estoppel issues.

For the foregoing reasons, it is hereby found that the grant of the Warsaw/Montreal motions and the entry of liability judgments in accordance thereto notwithstanding Eastern's defenses of lack of capacity, lack of authorization by the decedents' next of kin and application of foreign law in the cases of *Windbourne* (76 C 237), *Domangue* (76 C 241), *Mahfoud* (76 C 457), *Abbate* (76 C 251), *Alzozo* (76 C 252), *Daha* (76 C 253), *E. Bigio* (76 C 1023), *R. Bigio* (76 C 1024), *P. Hansen* (76 C 255), *W. Hansen* (76 C. 256), *Merkouris* (76 C 258), *Priniotakis* (76 C 260), *Alexandridis* (76 C 265), *Manias* (76 C 1022) and *Hadzis* (76 C 1025), and notwithstanding Eastern's defenses of lack of capacity to sue and application of foreign law in the

*Behar* (76 C 250), *Bright* (76 C 572) and *Hickey* (76 C 573) cases, present controlling questions of law as to which there are substantial grounds for a difference of opinion. It is further found that the manner in which the Warsaw/Montreal motions were instituted and granted, despite Eastern's defenses, in the *Windbourne* (76 C 237), *Domangue* (76 C 241), *Mahfoud* (76 C 457), *Behar* (76 C 250), *Abbate* (76 C 251), *Alzozo* (76 C 252), *Daha* (76 C 253), *Bright* (76 C 572), *Hickey* (76 C 573), *E. Bigio* (76 C. 1023) and *R. Bigio* (76 C 1024) cases presents a controlling question of law as to which there is substantial ground for difference of opinion. Furthermore, it is found that an appeal from all of the foregoing judgments will materially advance the ultimate termination of this litigation.

To finish the moment, Eastern Air Lines' motions and cross motions in the above captioned cases for certification pursuant to 28 U.S.C. § 1292(b) are granted in the respect set forth above. Eastern Air Lines is to settle separate orders on notice in each case in conformity with the foregoing decision on or before noon of May 22, 1979, said orders to be submitted in the consolidated cases under the consolidated numbers.

## IX

### SUMMARY OF RULINGS

Dismemberment may be necessary in aid of the process of analysis, but in the end there must be a synthesis that will bring the severed parts together.

*Marchant v. Mead-Morrison Mfg. Co.*, 252 N.Y.2d 284, 299, 169 N.E. 386, 391 (1929) (Cardozo, J.).

Accordingly, the *Behar* (76 C 250), *Abbate* (76 C 251), *Daha* (76 C 253), *Bright* (76 C 572), *Hickey* (76 C 573), *E. Bigio* (76 C 1023), *R. Bigio* (76 C 1024), *Alzozo* (76 C 252), *Windbourne* (76 C 237), *Domangue* (76 C 241) and *Mahfoud* (76 C 457) requests for Rule 54(b) relief and for a reaffirmance of the grant of their Warsaw/Montreal motions and the resultant liability judgments entered against Eastern Air Lines in accordance therewith are granted as set forth in sections I and II, *supra*, respectively.

Furthermore, the plaintiffs' requests in the *P. Hansen* (76 C 255), *W. Hansen* (76 C 256), *Merkouris* (76 C 258), *Priniotakis* (76 C 260), *Alexandridis* (76 C 265), *Manias* (76 C 1022) and *Hadzis* (76 C 1025) cases for a reaffirmance of the grant of their Warsaw/Montreal motions and resultant liability judgments entered against Eastern Air Lines in accordance therewith are granted as set forth in section III, *supra*.

The *R. Bigio* (76 C 1024), *E. Bigio* (76 C 1023), *Alzozo* (76 C 252), *Daha* (76 C 253), *Behar* (76 C 250) and *Abbate* (76 C 251) motions for a finding that the plaintiffs therein have capacity to sue are granted as set forth in section IV, *supra*.

Mr. Jennings' requests in the *Manias* (76 C 1022) and *Merkouris* (76 C 258) cases for a finding that this Court lacks subject matter jurisdiction are denied as set forth in section V, *supra*.

The motions of Mr. O'Rourke and Mary Hansen in the *Peter Schmidt Hansen* cases (76 C 225) and the motions of Mr. O'Rourke and Karin Marianne Hansen in the *Wolfgang Hansen* cases (76 C 256) are granted in part and presently denied in part as explicitly set forth in section VI, *supra*.

The applications of Mr. O'Rourke and Mr. Cappiello in the *Priniotakis* (76 C 260), *Alexandridis* (76 C 265), and *Hadzis* (76 C 1025) cases are presently denied as explicitly set forth in section VII, *supra*.

Finally, Eastern Air Lines motions for a certification of the Warsaw/Montreal judgments for appeal pursuant to 28 U.S.C. § 1292(b) (1976) in the *Windbourne* (76 C 237), *Domangue* (76 C 241), *Mahfoud* (76 C 457), *Behar* (76 C 250), *Abbate* (76 C 251), *Alzozo* (76 C 252), *Daha* (76 C 253), *Bright* (76 C 572), *Hickey* (76 C 573), *E. Bigio* (76 C 1023), *R. Bigio* (76 C 1024), *P. Hansen* (76 C 255), *W. Hansen* (76 C 256), *Merkouris* (76 C 258), *Priniotakis* (76 C 260), *Alexandridis* (76 C 265), *Manias* (76 C 1022) and *Hadzis* (76 C 1025) cases are granted as set forth in section VIII, *supra*.

Eastern Air Lines is hereby directed to make nine copies of this Memorandum and

Order and have said copies filed in nine of the cases involved herein. The plaintiffs are also directed to make nine copies of this Memorandum and Order and have said copies filed in the remaining nine actions involved herein. As to which of the nine cases the plaintiffs will make and file copies and which nine cases Eastern will make and file copies, said question is to be resolved by the plaintiffs and Eastern Air Lines.

The Clerk of this Court is hereby directed to file the copies of this Memorandum and Order received from the parties pursuant to the above direction in the appropriate file. In light of the above direction, the original copy of this Memorandum and Order is to be filed in the MDL 227 file.